[No. 29692-0-III.   Division Three.   February 12, 2013.]

THE STATE OF WASHINGTON, *Respondent*, v. JESSE ANTONIO MORENO, *Appellant*.

*Jesse Antonio Moreno*, pro se.

*Dennis W. Morgan*, for appellant.

*James P. Hagarty*, *Prosecutor*, and *Kevin G. Eilmes*, *Deputy*, for respondent.

¶1 BROWN, J. — Jesse Antonio Moreno appeals his convictions for first degree assault and unlawful possession of a firearm. He mainly contends the trial court erred in denying his motion to suppress evidence found in a car trunk searched pursuant to a search warrant and in sentencing him to an above-range sentence based on a gang-aggravator factor found by the jury. First, while Mr. Moreno argues his arrest was unlawful, we conclude the challenged evidence was in any event seized pursuant to a valid search warrant. Second, based on this record, we conclude the trial court acted within its discretion in ordering Mr. Moreno's

above-range sentence because sufficient evidence supports the gang-aggravator determination. Additionally, we reject Mr. Moreno's merger-based offender score argument but agree with his arguments that a domestic violence penalty and a jury fee were incorrectly imposed. Lastly, we find no merit in Mr. Moreno's pro se statement of additional grounds for review. Accordingly, we affirm Mr. Moreno's convictions and exceptional sentence but remand for sentencing corrections.

## FACTS

¶2 On October 15, 2009, Yakima Police Sergeant Joe Salinas responded to radio reports of shots fired in the 1500 block of McKinley Avenue and a "male wearing white jacket with dark jacket" seen running in a nearby alley. Report of Proceedings (RP) at 50. The ongoing reports started at 9:49 p.m. and continued with multiple 911 calls. A nearby officer reported shots fired. Rapidly, logged reports added that a house at the scene had been hit by gunfire and a vehicle was seen leaving the scene. Within about two minutes, Sergeant Salinas saw a car driving out of an alley at the scene "moving hurriedly," considering the unpaved and rutted state of most alleys. RP at 52. Sergeant Salinas blocked the car and turned on his emergency lights to investigate. Before being instructed, one occupant put his hands up. The driver was later identified as Joshua Bojorquez. The front seat passenger was Mr. Moreno. A juvenile occupied the rear seat. The occupants were known by police to have Norteño gang associations.

¶3 Sergeant Salinas shined a spotlight into the car and found it odd "the driver's wearing a red shirt." RP at 57. Sergeant Salinas knew the area had a violent crime history with many Sureño gang members living there who "claim blue" as their gang color. RP at 47-48. The rival Norteño gang claims the color red. Sergeant Salinas explained, "Nobody wears a red shirt in that neighborhood unless

they're asking for trouble, in my experience." RP at 57. Considering all, he thought "this car is somehow involved or . . . they can tell me more about what's happened." RP at 57. He became more suspicious about the occupants' Norteño ties as he questioned them. He noticed Mr. Moreno had a distinctive haircut associated with the Norteño gang, a "Mongolian" cut that involves a tuft of hair topping the head. RP at 63-64. Suspiciously, Mr. Bojorquez denied he was the brother of Chris Bojorquez, a known Norteño gang member, even though the last name is uncommon.

¶4 Sergeant Salinas asked the occupants if they had heard any gunshots or were shot at. Although the windows were rolled down, the occupants suspiciously denied hearing shots. He explained, "[T]hese individuals hadn't heard anything, which leads me to believe there's more to the story." RP at 66. Additionally suspicious, the occupants said they were smoking marijuana while in the alley but the sergeant did not smell marijuana, although another officer at some time apparently did smell marijuana on the juvenile passenger. While waiting for other officers to arrive, he removed Mr. Bojorquez before turning to Mr. Moreno to "freeze the scene." RP at 68. Controlling the scene was required to investigate and secure the shooting scene and partly "so that they don't have the time to communicate with each other and get their stories straight." RP at 68. Mr. Moreno was identified, frisked, handcuffed, and put in the back of a patrol car apart from the others.

¶5 Mr. Bojorquez gave permission to search the car interior, but not the trunk. This raised Sergeant Salinas' suspicion because many people involved in illegal activity know that a trunk or glove compartment cannot be searched without a warrant "and in five years of running the gang unit, that's exactly where they hid all their guns." RP at 71. He searched the car's passenger compartment, finding no evidence related to a shooting or marijuana use. Meanwhile, a witness approached and told Sergeant Salinas his house had been hit by gunfire. At this point in the investigation,

officers were still determining if bullets came from the stopped car or whether they were directed at the car.

¶6 Sergeant Erik Hildebrand, gang unit supervisor, responded to the scene shortly after 10:00 p.m. and took over the investigation after being advised of the circumstances by Sergeant Salinas. Sergeant Hildebrand questioned Mr. Bojorquez about why he was in the neighborhood. Sergeant Hildebrand explained, "[T]hese guys are all known and documented north side gang members or associates in a well-known south side gang neighborhood." RP at 177. Mr. Bojorquez and Mr. Moreno basically gave the same explanation of driving around, smoking marijuana, getting lost, and ending up in the alley. The juvenile occupant added he was in the area to spray-paint graffiti. After waiting for a drug recognition expert's arrival, Mr. Bojorquez was arrested for driving offenses.

¶7 Sergeant Hildebrand interviewed Edgar Ortiz, who repeated his earlier 911 report that he had heard shots, looked through his bedroom window, and saw a man shooting a gun near the corner of McKinley Avenue and Lewis Street who ran south on Lewis toward the alley after firing. Sergeant Hildebrand drove Mr. Ortiz to where Mr. Moreno was being held for a "show-up" identification. RP at 184. Mr. Ortiz tentatively identified Mr. Moreno, believing he had the same hair and build as the shooter, but he could not be sure because the shooter was wearing a hat and it was dark outside.

¶8 Officer Ileanna Salinas talked to several witnesses. They told her they had looked in the alley after hearing gunshots and saw the car that police had stopped going east down the alley. She found a black knit glove and a baseball cap in the alley. The glove was later connected by DNA[1] to Mr. Moreno. The hat was later connected by DNA to both Mr. Moreno and Mr. Bojorquez. She helped search the

---

[1] Deoxyribonucleic acid.

vehicle interior and found a sweatshirt she believed could be described as a dark jacket with a white stripe on the sleeve. The glove matched one later found in the car's trunk pursuant to a search warrant. When found, the hat and glove seemed warm and dry even though it had been wet out recently and the ground was muddy.

¶9 Based on the developed facts, Sergeant Hildebrand asked Officer Chris Taylor to get a search warrant. Sergeant Hildebrand believed the car's occupants were hiding guns in the trunk. Officer Taylor called Judge Susan Woodard around 10:50 p.m. to get the warrant. He asked to search the trunk for firearms and firearm paraphernalia based on sworn facts detailed in our analysis. Judge Woodard granted the warrant request. Officer Taylor found a sawed-off .12 gauge shotgun and a .357 Magnum revolver with six empty .38 shell casings in the trunk. He later applied for and received a search warrant to search the trunk for clothing, finding a matching black knit glove and a dark sweatshirt with a white lining. At trial, a ballistics expert opined that tests connected the revolver and casings to slugs collected at the scene.

¶10 Around 11:00 p.m., Troy Caoile called the police to report someone had shot at him. Sergeant Hildebrand spoke with him. Mr. Caoile related he had been walking north up Lincoln Avenue when somebody in a blue car yelled something about "south side." RP at 189. At trial, Mr. Caoile testified it was "South side LVL," and he believed the blue car he saw stopped at the end of the alley was the same car from which someone yelled "South side LVL." RP at 1346. "LVL" refers to the Little Valley Locos subset of the Sureños. RP at 1390. Mr. Caoile understood "South side LVL" to refer to the Sureños gang and said nothing in return. Mr. Caoile had lived in the area and knew "north siders don't go over there, and that's where the Surenos are hanging out at." RP at 1362. Mr. Caoile kept walking east on the 1500 block of McKinley Avenue until a man jumped out from around the corner at Lewis Street and began shooting

at him. He said that the shooter had some facial hair and was wearing a black hooded sweatshirt over a baseball cap. Mr. Caoile first identified Mr. Moreno from a photomontage and later identified Mr. Moreno at trial. Calling out "south side," Sergeant Hildebrand explained at the suppression hearing, would be useful for Norteños in identifying a rival gang member as a target.

¶11 The State charged Mr. Moreno with first degree assault and unlawful possession of a firearm. Mr. Moreno moved to suppress all of the evidence found in the trunk. The court concluded that the stop and detention of Mr. Moreno was lawful and that evidence in the trunk was obtained as a result of a valid search warrant rather than the arrest of Mr. Moreno.

¶12 At trial, the State's theory was a gang related shooting while "putting in work" by Mr. Moreno with Mr. Bojorquez as an accomplice. Mr. Caoile testified as noted above and identified Mr. Moreno as the shooter. Sergeant Salinas, Officer Salinas, and Sergeant Hildebrand testified about particular characteristics of Yakima gangs. Sergeant Salinas opined that the Norteños and Sureños are the largest Yakima gangs, giving specific examples of appearance and behaviors. He explained the Norteños and Sureños "claim an allegiance" to the colors red and blue, respectively. RP at 985. According to Officer Salinas, the two gangs are rivals: "They see each other out on the street and it's a constant battle. It's violence anywhere within the city. They see each other, it's a fight, it's shots fired." RP at 1061-62. Sergeant Salinas explained that northeast Yakima is Norteño territory and north central Yakima in Sureño territory. He testified that gang members from the northeast "would load up in a car . . . and travel to the rival gang neighborhood to cause trouble." RP at 988. He said that gang members do not generally drive to rival territory "to say hi" or visit relatives. RP at 1007.

¶13 Sergeant Hildebrand testified that Yakima gangs have unique customs, cultures, and values and in Yakima, they are uniquely territorial. He explained:

> Again, the unique thing for us in Yakima and working for the police department here, talking to gang investigators elsewhere is that we have the ability that if, if somebody from the gang unit recognizes a Norteno gang member say driving down McKinley Avenue, our red flags, no pun intended, are going to go up and we're going, we're going to know something's not right.

RP at 1393. He and Officer Salinas both explained being in rival gang territory often meant the gangs are "putting in work." RP at 1394. As an expectation of gang membership in Yakima, Officer Salinas, from her experience, defined "putting in work" as "to actively participa[te] in some act of violence on another gang member, or just a random citizen who's not affiliated with any gangs." RP at 1062. Officer Salinas testified putting in work is done because "they get respect from other individuals in their gang." RP at 1064. Additionally, Sergeant Hildebrand explained the significance of "putting in work" for Yakima gangs:

> The gang itself and the members, they thrive on intimidation and fear, and by gang members going out and putting in work, they basically gain respect. . . . They gain respect, they gain rank . . . . Essentially that's all they have to do, to look forward to. Most of them don't work. Most of them don't go to school. And they get basically recognition and support from going out and putting in work. The more . . . work they put in, the more recognized they are. . . . [T]hey have to go out and put in work if they want to be a part of the gang.

RP at 1394-95.

¶14 In closing, the State partly argued the DNA and ballistics evidence admitted during trial pointed to Mr. Moreno as the shooter and emphasized evidence of a jail recording showing Mr. Bojorquez admitted he was involved in a drive-by shooting. The State explained how the "putting in work" evidence showed gang activity. The State emphasized the aggrandizement evidence showed Mr. Bojorquez and Mr. Moreno were Norteño gang members and yelling "South side LVL" to Mr. Caoile was "targeting" a potential

rival gang member. RP at 1825. Regarding the gang aggravator instruction, the State specifically argued, "[W]hy would they be shooting at Mr. Caoile? There's no other reason, except for the fact he's been misidentified as a rival gang member or gang member in the neighborhood." RP at 1839.

¶15 The jury found Mr. Moreno guilty of first degree assault and first degree unlawful possession of a firearm. It found the crimes were committed "with intent to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang[,] its reputation, influence, or membership." Clerk's Papers (CP) at 336, 251. The court imposed an aggravated exceptional sentence. Mr. Moreno appealed.

## DISCUSSION

### A. Evidence Suppression

¶16 The issue is whether the trial court should have excluded the evidence found in the trunk. Mr. Moreno contends the search warrant for the trunk followed from an unlawful stop and arrest. While Mr. Moreno raises arguable issues regarding the initial stop and extended detainment, we conclude, as did the trial court, that because the challenged evidence was seized pursuant to valid search warrants, the evidence collected from the car trunk was in any event properly admissible at trial.

¶17 The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. *State v. Williams*, 102 Wn.2d 733, 736, 689 P.2d 1065 (1984). "[W]arrantless searches and seizures are per se unreasonable" unless the search or seizure falls within an exception to the warrant requirement. *Id.* (citing *State v. Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980)). The defendant must show that a seizure occurred. *State v. Young*, 135 Wn.2d 498, 510, 957 P.2d 681 (1998). A seizure occurs when, "due to

an officer's use of physical force or display of authority, an individual's freedom of movement is restrained and the individual would not believe that he is free to leave or decline a request." *State v. Beito*, 147 Wn. App. 504, 508, 195 P.3d 1023 (2008). A driver may be seized when a police officer pulls behind his car and activates his emergency lights. *State v. DeArman*, 54 Wn. App. 621, 624, 774 P.2d 1247 (1989). Sergeant Salinas seized Mr. Moreno by blocking Mr. Bojorquez's car with his patrol car and activating his emergency lights. The question is whether that seizure was lawful under the totality of the circumstances.

¶18 The State must show a seizure falls within a warrant exception. *State v. Armenta*, 134 Wn.2d 1, 10, 948 P.2d 1280 (1997). If not, the evidence obtained as a result of the seizure must be suppressed. *State v. Kennedy*, 107 Wn.2d 1, 4, 726 P.2d 445 (1986). We review findings of fact made in a ruling on a motion to suppress for substantial evidence. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003). Mr. Moreno assigns error to various findings but does not support the assignments with argument. Those findings are then verities on appeal. *See State v. Ross*, 106 Wn. App. 876, 880, 26 P.3d 298 (2001). We review the court's conclusions of law de novo. *Id.*

¶19 Mr. Moreno first contends Sergeant Salinas conducted an unlawful *Terry*[2] stop because he stopped the car on nothing more than a hunch. According to Mr. Moreno, the innocuous facts identified by Sergeant Salinas—Mr. Moreno's location in the alley, the car moving "hurriedly," and one of the car's occupants wearing a red shirt in a Sureño neighborhood—were not enough to justify the stop. The State responds that the totality of the circumstances justified the initial stop. Considering the totality of the circumstances, we agree.

¶20 The *Terry* stop is an exception to the warrant requirement. *State v. Hendrickson*, 129 Wn.2d 61,

---

[2] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

71, 917 P.2d 563 (1996). The purpose of a *Terry* stop " 'is to allow the police to make an intermediate response to a situation for which there is no probable cause to arrest but which calls for further investigation.' " *Armenta*, 134 Wn.2d at 16 (quoting *Kennedy*, 107 Wn.2d at 17 (Dolliver, J., dissenting)). Law enforcement may make a *Terry* stop when an officer can " 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *State v. Glover*, 116 Wn.2d 509, 514, 806 P.2d 760 (1991) (quoting *Terry*, 392 U.S. at 21). In other words, "[t]he circumstances must suggest a substantial possibility that the particular person has committed a specific crime or is about to do so." *State v. Martinez*, 135 Wn. App. 174, 180, 143 P.3d 855 (2006) (citing *State v. Cordero Garcia*, 125 Wn.2d 239, 242, 883 P.2d 1369 (1994)).

¶21 We look at the totality of the circumstances. *Glover*, 116 Wn.2d at 514 (citing *United States v. Cortez*, 449 U.S. 411, 418, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)). This includes the officer's training and experience. *Id.* A *Terry* stop should be minimally intrusive in that the seizure must be " 'reasonably related in scope to the justification for [its] initiation.' " *Armenta*, 134 Wn.2d at 16 (internal quotation marks omitted) (quoting *Kennedy*, 107 Wn.2d at 17 (Dolliver, J., dissenting)). A hunch alone does not warrant police intrusion into people's everyday lives. *State v. Doughty*, 170 Wn.2d 57, 63, 239 P.3d 573 (2010). And innocuous facts alone do not justify a stop. *State v. Tijerina*, 61 Wn. App. 626, 629, 811 P.2d 241 (1991). Being in a high-crime area at night, for example, is not enough to justify a stop when there is no evidence that a particular crime had been committed. *See Glover*, 116 Wn.2d at 514; *State v. Thompson*, 93 Wn.2d 838, 842, 613 P.2d 525 (1980); *Martinez*, 135 Wn. App. at 180; *State v. Richardson*, 64 Wn. App. 693, 697, 825 P.2d 754 (1992).

¶22 A police officer may rely on his experience to evaluate apparently innocuous facts. *Martinez*, 135 Wn. App. at 180 (citing *State v. Samsel*, 39 Wn. App. 564, 570-71,

694 P.2d 670 (1985)). Facts "which appear innocuous to the average person may appear incriminating to a police officer in light of past experience." *Samsel*, 39 Wn. App. at 570. Police officers are not required to set aside that experience. *Id.* at 570-71. Mr. Moreno argues the stop here was based on nothing more than a hunch. But here, officers were essentially responding to a crime in progress. *See Thompson*, 93 Wn.2d at 842; *Martinez*, 135 Wn. App. at 181-82. Multiple reports of gunfire had been reported one block away just moments before the stop. Sergeant Salinas had considerable experience with gangs in this specific area. He knew the shots came in a Sureño neighborhood. He saw Mr. Bojorquez was wearing a red shirt, associated with the rival Norteño gang. He knew people would not be expected to wear red in a Sureño neighborhood. He saw the car leaving the alley hurriedly considering the poor alleyway conditions. Given all, Sergeant Salinas reasonably believed "this car is somehow involved or . . . they can tell me more about what's happened." RP at 57.

¶23 Mr. Moreno next contends he was unlawfully arrested when he was handcuffed and placed in the patrol car. But he fails to persuade us any of the challenged evidence was tainted by any unlawful arrest; thus, we need not analyze this contention. *See Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). Evidence derived from unlawful police conduct may be suppressed under the exclusionary rule. *State v. Gaines*, 154 Wn.2d 711, 716-17, 116 P.3d 993 (2005). Under the "fruit of the poisonous tree doctrine," this rule applies to evidence obtained directly or indirectly from police conduct. *State v. Tan Le*, 103 Wn. App. 354, 361, 12 P.3d 653 (2000). This requires a causal link between the unlawful police conduct and the evidence obtained. *State v. Rothenberger*, 73 Wn.2d 596, 600-01, 440 P.2d 184 (1968).

¶24 Mr. Moreno does not persuasively argue, nor do we see, any causal connection between the unlawful arrest and the search warrant. *See id.* Nor does he challenge the

sufficiency of the search warrant application. Indeed, a review of the search warrant application shows Mr. Moreno's unlawful arrest did not lead to the search warrant. Again, the first warrant application contained the following facts:

- At 9:49 p.m., dispatch received a call regarding shots fired near the 1500 block of McKinley Avenue
- A witness saw a man running south down the alley and the man was wearing a dark jacket with a white jacket
- Officers saw a man running down the alley
- Officers observed a car in the McKinley Avenue's south alley
- The car contained two known Norteño members and a known Norteño associate
- Officers observed a black jacket with a white lining in the backseat of the car
- Officers saw bullet holes at 1507 and 1509 McKinley Avenue
- Officers found .22 caliber casings
- A victim said that the shooter ran south bound down the alley

Ex. J. The police obtained most of this evidence from sources other than Mr. Moreno. The sole evidence obtained from Mr. Moreno was his admission of Norteño ties, a fact already known to law enforcement and additionally verified during the valid *Terry* stop. Accordingly, the evidence gathered from the trunk was not the fruit of Mr. Moreno's unlawful arrest and the court correctly admitted the evidence. The second warrant application for the clothing is not separately contested.

## B. Criminal Street Gang Finding

¶25  Mr. Moreno next contends insufficient evidence supports the jury's finding that he committed these crimes to advance his position in a criminal street gang. He contends

(1) evidence presented on the issue is condemned profile evidence, (2) no nexus exists between the crimes and gang membership, and (3) the evidence is speculative concerning the gang aggravating factor.

¶26 A finding of fact supporting an exceptional sentence will be reversed solely when " 'no substantial evidence' " supports it. *State v. Jeannotte*, 133 Wn.2d 847, 856, 947 P.2d 1192 (1997) (quoting *State v. Grewe*, 117 Wn.2d 211, 218, 813 P.2d 1238 (1991)). A court may impose a sentence higher than the standard range if a jury finds that "[t]he defendant committed the offense with the intent to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang as defined in RCW 9.94A.030, its reputation, influence, or membership." RCW 9.94A.535(3)(aa). "Criminal street gang" is defined as

> any ongoing organization, association, or group of three or more persons, whether formal or informal, having a common name or common identifying sign or symbol, having as one of its primary activities the commission of criminal acts, and whose members or associates individually or collectively engage in or have engaged in a pattern of criminal street gang activity.

RCW 9.94A.030(12).

¶27 Mr. Moreno relies on *State v. Suarez-Bravo* and *State v. Scott* to argue the evidence is insufficient to support the street gang sentence enhancement. *State v. Suarez-Bravo*, 72 Wn. App. 359, 864 P.2d 426 (1994); *State v. Scott*, 151 Wn. App. 520, 213 P.3d 71 (2009). Specifically, he argues the evidence of gang membership was inherently prejudicial criminal profile evidence used to make a random act of violence appear gang related. Br. of Appellant at 21 (citing *Suarez-Bravo*, 72 Wn. App. at 365). He argues the State showed no nexus between the first degree assault and gang membership. Br. of Appellant at 22 (citing *Scott*, 151 Wn. App. at 526-27). *Suarez-Bravo* and *Scott* are not helpful. Both address evidence admissibility, not evidence sufficiency. *See Scott*, 151 Wn. App. at 526 (evidence of gang

membership is not relevant unless evidence shows a nexus between the crime and gang membership); *Suarez-Bravo*, 72 Wn. App. at 364-65 (concluding evidence defendant lived in a high-crime area was too prejudicial and it "smacks of prohibited profile evidence" because it merely suggested that the defendant was a criminal type).

¶28 No case law addresses the criminal street gang sentencing enhancement. But several cases address whether evidence sufficiently supported a similar aggravating factor if the "defendant committed the offense to obtain or maintain his or her membership or to advance his or her position in the hierarchy of an organization, association, or identifiable group." RCW 9.94A.535(3)(s). Cases addressing that statute have required a nexus between the crime charged and the defendant's actual gang-related motivations. *State v. Bluehorse*, 159 Wn. App. 410, 431, 248 P.3d 537 (2011).

¶29 Some evidence must show gang involvement actually motivated the defendant to commit a crime to support RCW 9.94A.535(3)(s)'s gang aggravating factor. *State v. Yarbrough*, 151 Wn. App. 66, 210 P.3d 1029 (2009). In *Yarbrough*, Mr. Yarbrough yelled gang-related insults and challenges before shooting two people. *Id.* at 97. The evidence showed Mr. Yarbrough's gang had a run-in with a rival gang a few days prior to the shooting and that Mr. Yarbrough believed that the victims were members of that rival gang. *Id.* In *State v. Monschke*, 133 Wn. App. 313, 318-19, 135 P.3d 966 (2006), Mr. Monschke and three other white supremacists beat a homeless man to death. In both cases, some evidence showed the defendants committed their crimes because of their gang membership. Testimony from police or other gang experts is insufficient, standing alone, to support the aggravating factor. *Bluehorse*, 159 Wn. App. at 431.

¶30 Here, sufficient evidence showed Mr. Moreno had ties to the Norteños gang and Mr. Moreno acknowledged those ties. Mr. Moreno and two others identified as

having Norteños ties were, without credible reason, found in Sureños territory hurriedly leaving the scene of a reported shooting. Police expert testimony sufficiently showed specific local gang facts: (1) the Norteños rivaled the Sureños, and both gangs were uniquely territorial, not invading rival gang turf without specific reason; (2) Norteños sometimes came to Sureños territory to put in work; (3) putting in work was a way of maintaining or improving one's status in a gang; and (4) putting in work included committing random acts of violence or attacking rival gang members. Significantly, Mr. Caoile testified a person he identified as Mr. Moreno in the front passenger side of a blue car called out the gang name "South side LVL" to him shortly before Mr. Moreno shot at him. RP at 1346. "LVL" refers to the Little Valley Locos subset of the Sureños. RP at 1390.

¶31 From these facts, the State could and did argue Mr. Moreno was putting in work when shooting at Mr. Caoile as either a random act of violence or more likely a misidentified rival gang member. The jury could, in weighing the testimony and deciding credibility from the sufficient evidence presented, infer the assault was committed to directly or indirectly cause benefit to a gang. Considering all, we conclude the evidence shows a sufficient nexus between the crime and gang membership to prove the gang aggravator. Therefore, the sentencing court properly imposed an exceptional sentence.

## C. Offender Score

¶32 Mr. Moreno next contends the trial court incorrectly calculated his offender score. He argues that because gun possession elevated second degree assault to first degree assault, first degree assault and unlawful possession of a firearm should have merged for purposes of calculating his offender score. The State responds that the crimes do not merge because unlawful possession of a firearm is not

necessarily committed every time a person commits first degree assault.

¶33 Whether two crimes merge is a question of law we review de novo. *See State v. Freeman*, 153 Wn.2d 765, 770, 772-73, 108 P.3d 753 (2005). The merger doctrine is a rule of statutory construction. *State v. Vladovic*, 99 Wn.2d 413, 420-21, 662 P.2d 853 (1983). The goal of the merger doctrine, as with any rule of statutory construction, is to determine the legislature's intent. *State v. Sweet*, 138 Wn.2d 466, 478, 980 P.2d 1223 (1999).

¶34 The legislature intended to "punish both offenses through a greater sentence for the greater crime" when two crimes merge. *Freeman*, 153 Wn.2d at 773. Two crimes merge when one crime is elevated to a higher degree by committing another act that the criminal statutes also define as a crime. *Vladovic*, 99 Wn.2d at 421. If one crime (unlawful possession of a firearm) need not be committed to elevate another crime (first degree assault) to a higher degree, the two crimes at issue do not merge. *See id.* at 421-22.

¶35 The crimes here are first degree assault and unlawful possession of a firearm. "A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm . . . [a]ssaults another with a firearm." RCW 9A.36.011(1)(a); CP at 13. Assaulting a person with a "deadly weapon" is second degree assault. RCW 9A.36-.021(1)(c). So, assaulting another with a firearm, rather than any other deadly weapon, raises second degree assault to first degree assault. Unlawful possession of a firearm is when a "person owns, has in his or her possession, or has in his or her control any firearm after having previously been convicted . . . in this state . . . of any serious offense as defined by this chapter." RCW 9.41.040(1)(a).

¶36 Unlawful possession of a firearm does not elevate second degree assault to first degree assault because one need not unlawfully possess a firearm to raise second degree assault to first degree assault. *See* RCW 9A.36-

.011(1)(a). An assault with a firearm is first degree assault regardless of whether the assaulter had previously been convicted of a serious offense. *See* RCW 9A.36.011(1)(a). The two crimes therefore do not merge. Accordingly, first degree assault and unlawful possession of a firearm were properly counted as separate crimes.

### D. Domestic Violence Assessment and Jury Fee

¶37 Mr. Moreno contends and the State properly concedes the court improperly imposed a $100.00 domestic violence assessment and a $5,780.50 jury fee. We review de novo a trial court's interpretation of the relevant statutes. *State v. Hathaway*, 161 Wn. App. 634, 652, 251 P.3d 253, *review denied*, 172 Wn.2d 1021 (2011).

¶38 Superior courts "may impose a penalty assessment not to exceed one hundred dollars on any person convicted of a crime involving domestic violence." RCW 10.99.080(1). "Domestic violence" includes first degree assault "committed by one family or household member against another." RCW 10.99.020(5)(a). The State concedes no evidence shows Mr. Moreno and Mr. Caoile were family or household members. Imposing the $100 domestic violence fee was therefore incorrect.

¶39 The jury fee here surpassed a $250 statutory cap on jury fees. *See Hathaway*, 161 Wn. App. at 651-53. In *Hathaway*, Division Two of this court interpreted three statutory provisions addressing jury fees and ultimately concluded that RCW 36.18.016(3)(b) caps a "jury demand fee" at $250 when a 12-person jury is called in a criminal trial. *Id*. at 653. The State here concedes the *Hathaway* analysis is correct. The jury fee should have been capped at $250.

### E. Statement of Additional Grounds (SAG)

¶40 First, Mr. Moreno argues pro se that the trial court erred in denying his suppression motion because of factual

errors in the application for the warrant to search the car's trunk. Second, he argues, as did his appointed counsel, that because his seizure was improper, the evidence seized from the car's trunk should have been suppressed. Because we have adequately addressed the second argument above in our suppression analysis, we address solely his first argument.

¶41 Mr. Moreno argues Officer Taylor misrepresented that police found a .22 caliber bullet in the passenger compartment of the car and made other "multiple material misrepresentations." SAG at 1. A search warrant "must be voided and the fruits of the search excluded" when a search warrant contains a false statement made knowingly, intelligently, or with reckless disregard for the truth, and that statement is necessary to establishing probable cause. *Franks v. Delaware*, 438 U.S. 154, 156, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). Mr. Moreno must make a "substantial preliminary showing" that the false statement was made knowingly, intelligently, or with reckless disregard for the truth, and that statement is necessary to establishing probable cause. *Id*. at 155-56.

¶42 The trial court concluded, and we agree, that Mr. Moreno presented no evidence that such a misstatement was deliberate or reckless. The trial court properly denied Mr. Moreno's *Franks* motion.

¶43 We affirm the convictions and remand for sentence correction.

KORSMO, C.J., concurs.

¶44 SWEENEY, J. (concurring and dissenting) — I concur with the majority's conclusion that the challenged evidence was seized pursuant to a valid search warrant, but I do not agree with its conclusion that the court properly sentenced Jesse Antonio Moreno to a sentence above the standard range based on a gang aggravator. Accordingly, I dissent

from that portion of the opinion affirming the exceptional sentence.

PROCEDURAL HISTORY

¶45 We originally filed an opinion on September 18, 2012, that reversed the gang aggravator for the reasons set out in this dissent. Pursuant to a request to publish by Judge Marywave Van Deren from Division Two of this court, we unanimously ordered publication of this opinion on October 11, 2012. The State moved for reconsideration on October 8, 2012. There was no change in the law, and there were no new facts disclosed after we issued our unanimous opinion. The court nonetheless granted the State's motion for reconsideration and ordered withdrawal of the original opinion on November 15, 2012.

ANALYSIS

¶46 In order for the court to impose a sentence above the standard range based upon a gang aggravator, the State was required to show that Mr. Moreno committed the charged offense "with the intent to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang as defined in RCW 9.94A.030, its reputation, influence, or membership." RCW 9.94A.535(3)(aa). This requires a showing that the defendant committed a crime to "obtain or maintain his . . . membership or to advance his . . . position in the hierarchy of an organization, association, or identifiable group." RCW 9.94A.535(3)(s).

¶47 The State must also establish a nexus between the charged crime and the defendant's actual gang-related motivations. *State v. Bluehorse*, 159 Wn. App. 410, 431, 248 P.3d 537 (2011); *see State v. Yarbrough*, 151 Wn. App. 66, 210 P.3d 1029 (2009); *State v. Monschke*, 133 Wn. App. 313, 135 P.3d 966 (2006). Gang membership alone and general statements from police or gang experts are not sufficient to support the aggravating factor. *State v. Clark*, 170 Wn. App. 166, 283 P.3d

1116 (2012), *petition for review filed*, No. 88163-4 (Wash. Dec. 6, 2012); *Bluehorse*, 159 Wn. App. at 431.

¶48 The evidence to support the gang aggravator here falls short of establishing that the crime was committed to advance gang membership. The fact that Mr. Moreno belonged to a gang and was heard calling out a gang name before the shooting, together with general police testimony regarding local gangs, does not establish the requisite nexus between the specific crime and actual gang-related motivations.

¶49 *Bluehorse* is dispositive. 159 Wn. App. 410. Mr. Bluehorse, a Crips gang member, shot into the front yard barbecue of several Bloods gang members. *Id.* at 416. Somebody yelled a Crips-related phrase before the shooting began. *Id.* at 417. Mr. Bluehorse shot a non-gang-member bystander. *Id.* at 416. The State presented evidence that Mr. Bluehorse belonged to a gang but no evidence of Mr. Bluehorse's actual motivation behind the shooting. *Id.* at 431. For example, nobody testified that Mr. Bluehorse generally wanted to advance his position in the gang or had ever committed drive-by shootings to advance or maintain his gang status before. *Id.* Like here, a police officer testified about the traditional rivalry between the two gangs and that people may commit crimes to gain gang membership or advance their status in a gang. *Id.* at 418. The court concluded that the evidence was so broad that it effectively relieved the State of its burden of proof:

> [W]ithout evidence relating to Bluehorse's motivation, the gang sentencing aggravator would be intolerably broadened by allowing it to attach automatically whenever an aspiring or full gang member is involved in a drive-by shooting based on the detectives' generalized gang testimony; thus relieving the State of its burden to prove beyond a reasonable doubt that the specific defendant charged with a drive-by shooting sought to obtain, maintain, or advance his gang membership.

*Id.* at 431. The court ultimately concluded that evidence was insufficient to support the aggravating factor. *Id.*

¶50 *Bluehorse* addresses a different aggravating factor. But the reasoning applies equally to the enhanced sentence here. Here, only police generalizations about gang behavior tie Mr. Moreno's crimes to any intent to cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang, its reputation, influence, or membership. RCW 9.94A.535(3)(aa). That police testimony is not evidence of Mr. Moreno's intent in and of itself. *See Yarbrough*, 151 Wn. App. at 97 (stating that expert testimony that gang members "gain status within the gang by being willing to engage in gunplay to defend the gang's honor," when combined with evidence of Mr. Yarbrough's intent, supported the aggravating factor); *Monschke*, 133 Wn. App. at 333-34 (stating that expert testimony that white supremacists can gain status in the National Alliance by murdering an " 'inferior' " person supported the aggravating factor when combined with direct evidence). Moreover, to uphold the aggravating factor on the evidence here would allow the aggravating factor to attach whenever a gang member commits a crime. *See Bluehorse*, 159 Wn. App. at 431. I therefore conclude the exceptional sentence is not supported and would remand for resentencing as we previously unanimously held.

¶51 Accordingly, I respectfully dissent.

Review denied at 177 Wn.2d 1021 (2013).