IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31868-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WESLEY JAMES WEYAND, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — *Daddy, Don't You Walk So Fast.* Wayne Newton.

Once again we are asked to rule whether law enforcement had individualized

articulable suspicion to stop and question an accused. The accused, Wesley Weyand,

exited from a known drug house, walked quickly to a car, and looked up and down the

street before entering the car. As a result of a stop of the car, a police officer arrested

Weyand on a warrant, and, pursuant to a search incident to arrest, the officer found heroin

on Weyand's person. After denying Weyand's suppression motion, the trial court found

Weyand guilty of unlawful possession of a controlled substance. Weyand appeals the denial of the motion. We affirm.

## FACTS

Critical to the trial court's denial of the motion to suppress is a two-year history of 95 Cullum, to which Corporal Henry testified during the motion hearing. Henry is a drug recognition expert with the City of Richland Police Department. During the early morning of December 22, 2012, Corporal Bryce Henry patrolled the area near 95 Cullum, Richland, a known drug house.

On June 10, 2011, law enforcement conducted a search warrant at 95 Cullum. Police then arrested Gerald Hyde for possession of methamphetamine, and Hyde told officers he purchased methamphetamine from Blake Hendon at 95 Cullum. Officers found methamphetamine inside the home during the search and arrested numerous individuals for possession of a controlled substance.

On January 9, 2012, the Richland Police Department received a call from a person who inquired about helping Michelle Eggers, a methamphetamine user. Eggers lived at 95 Cullum.

On January 10, 2012, law enforcement journeyed to 95 Cullum to arrest resident John Gray, sought on felony warrants. Officers found Gray at the residence, apprehended him, and found a controlled substance on his person.

On March 9, 2012, Richland officers went to 95 Cullum to locate a suspect. They

2

found and arrested Apolonio Saldana and Melissa Eggers on misdemeanor warrants.

On May 18, 2012, an anonymous caller to law enforcement complained that four or five residents of 95 Cullum look to be "tweaking" on narcotics. Clerk's Papers (CP) at 69. Michelle Eggers, Tracy Wilson, and John Gray then lived at the house.

On June 16, 2012, Richland Police Officer Nash spoke to a resident of the neighborhood on an unrelated topic. The neighbor complained of a high flow of short stay foot traffic at 95 Cullum, and he requested extra patrols in the area. On June 20, 2012, the Richland Police Department sent a landlord notification letter to Barbara Wilson, the owner of 95 Cullum, due to residents at the home with extensive criminal histories.

On August 5, 2012, police officers arrested ubiquitous Melissa Eggers for a warrant while she rode in a vehicle with Derrick Cady and Jason Lebert. Cady was a violent offender with safety alerts due to his being a suspect in a home invasion burglary. Lebert had been arrested three times for possession of a controlled substance and once for unlawful possession of a firearm. During the arrest, Eggers stated she and her two companions just left 95 Cullum.

On September 26, 2012, law enforcement officers saw Melisa Eggers and Eric Marple on a Richland street. Both ran. Police stopped Eggers, who they found under the influence of methamphetamine. She also displayed track marks on her arms. Officers

3

found Marple hiding in a backyard. He also was high on methamphetamine. Eggers stated they both just exited 95 Cullum.

On October 27, 2012, officers arrested Melissa Eggers at 95 Cullum. On November 6, 2012, officers cruised to 95 Cullum to locate John Gray. Police approached Michelle Eggers on the porch, and she advised Gray was not home. Gray nonetheless exited the residence and police arrested him. Three purses and a glass smoking device with residue sat next to Eggers on the porch. Officers obtained a search warrant for the purses. A crystal substance in paper, a broken glass pipe with burnt residue, a plastic bag with a green powdery substance, a silver marijuana pipe with residue, and a wood and plastic smoking device with residue therein rested in the purses. Law enforcement arrested Eggers for possession of a controlled substance.

On December 9, 2012, law enforcement stopped a vehicle in the area of the Richland Winco grocery store. The driver of the vehicle, Dexter Wallace, eluded officers by running from the vehicle. Police captured Wallace, and a search of his vehicle produced methamphetamine. Occupants of the vehicle informed police that they had just left Richland's 95 Cullum. On December 18, 2012, Richland police executed a search warrant at 95 Cullum. During the search, an occupant of the familiar home told police that Wallace had sought to buy methamphetamine, at the home, before his December 9 arrest.

On December 12, 2012, Ivan Tyshchuk was arrested for being under the influence

4

of heroin, after exiting a stolen vehicle parked 150 feet from 95 Cullum. Tyshchuk stated that he was staying at 95 Cullum.

On December 18, 2012, police officers on patrol located a stolen vehicle in the driveway of 95 Cullum. Michelle Eggers, Apolonio Saldana, Genesis Garza, Francisco Nunez, Abby McDowell, and Tracy Wilson then occupied the home. Officers obtained a search warrant for the residence. The officers seized two smoking pipes containing methamphetamine, a clear plastic baggy containing methamphetamine, a broken glass pipe, a cropper with a clear liquid, a kit with an eyeglass case, two silver colored spoons with residue inside the kit, plastic baggie pieces, and small bits of cotton that appeared burned. Police arrested Nunez for possession of stolen property, Eggers for possession of a controlled substance, McDowell for possession of a controlled substance and taking a motor vehicle without permission, and Saldana for taking a motor vehicle. Every individual in the house possessed a drug history. During her arrest, Abby McDowell told officers that she hated staying at 95 Cullum but she had nowhere else to go. She said "a ton of people" are always inside the residence and she is weary of the "meth junkies" that frequent the house. CP at 71. McDowell named known drug offenders that frequented 95 Cullum.

During the motion to suppress hearing, the State of Washington argued that the history of 95 Cullum established that individuals visiting and inhabiting 95 Cullum often possessed and used controlled substances. Individuals visited 95 Cullum in order to

5

purchase controlled substances.

We forward to December 22, 2012. At 2:40 a.m., Richland Corporal Bryce Henry drove by 95 Cullum. Twenty minutes later, Corporal Henry again drove by 95 Cullum. He then saw a tan Buick, not earlier present, parked 50 feet north of the house. Henry parked his vehicle along the street so that he could see the Buick and the entrance to 95 Cullum.

Two minutes later, Corporal Bryce Henry saw two men exit 95 Cullum. They walked quickly to the tan Buick, and both looked around the area. We are not told if the Buick was parked on the same side of the street as the location of the house or whether the two men crossed the street to access the car. We are not informed of the clothing worn by the two. The male entering the driver's side of the Buick looked down Cullum both ways again and then, after a few seconds, entered the car. The car traveled down Cullum. Based on his knowledge of drug activity at 95 Cullum and suspicious conduct of the two men, Bryce Henry believed the men inside the car may possess a controlled substance. Therefore, he stopped the Buick.

Corporal Bryce Henry waited a few minutes for a cover officer to arrive before approaching the Buick. Henry spoke first to the vehicle's driver and then to its passenger, Wesley Weyand. Dispatch informed Henry of an outstanding warrant for Weyand's arrest. Corporal Henry arrested Weyand. In searching Weyand's person incident to arrest, Henry found a capped syringe filled with heroin.

PROCEDURE

The State of Washington charged Wesley Weyand with unlawful possession of a controlled substance in violation of RCW 69.50.4013(1). Weyand moved to suppress statements and evidence under CrR 3.5 and CrR 3.6. Weyand, relying on *State v. Doughty*, 170 Wn.2d 57, 239 P.3d 573 (2010), argued that Corporal Bryce Henry lacked the requisite articulable suspicion to stop the Buick. The trial court conducted a hearing on Weyand's suppression motion. Corporal Bryce Henry testified to the history of 95 Cullum. He admitted that he had never previously encountered Wesley Weyand and had no knowledge of Weyand frequenting 95 Cullum.

The trial court denied Weyand's motion to suppress, reasoning that *Doughty* was distinguishable based on the history of 95 Cullum as a drug house. By stipulated facts, the court at trial found Weyand guilty. The trial court sentenced Weyand to twelve months and one day incarceration.

LAW AND ANALYSIS

The trial court entered findings of fact and conclusions of law based on evidence at the suppression hearing. The findings enumerated the history at 95 Cullum. Weyand does not challenge those findings on appeal. Therefore, we accept the history related by Bryce Henry as to the home at 95 Cullum as a verity. The rule in Washington is that unchallenged findings entered after a suppression motion hearing are verities on appeal. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003); *State v. Hill*, 123 Wn.2d 641,

7

647, 870 P.2d 313 (1994). Although we accept the facts found by the trial court as true, we review the constitutionality of the warrantless stop de novo as a question of law. *State v. Gatewood*, 163 Wn.2d 534, 539, 182 P.3d 426 (2008).

As a general rule, warrantless searches and seizures are per se unreasonable, in violation of the Fourth Amendment and article I, section 7 of the Washington State Constitution. *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002). Wesley Weyand does not argue that the Washington Constitution provides him any added protection.

There are a few jealously and carefully drawn exceptions to the warrant requirement, which include exigent circumstances, searches incident to a valid arrest, inventory searches, plain view searches, and *Terry* investigative stops. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). This appeal concerns a *Terry* stop, named for *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The State bears the burden of demonstrating that a warrantless seizure falls into a narrow exception to the rule. *State v. Doughty*, 170 Wn.2d at 61. A seizure is not justified by what a subsequent search discloses. *State v. Lesnick*, 84 Wn.2d 940, 944, 530 P.2d 243 (1975).

The purpose of a *Terry* stop is to allow the police to make an intermediate response to a situation for which there is no probable cause to arrest but which calls for further investigation. *State v. Armenta*, 134 Wn.2d 1, 16, 948 P.2d 1280 (1997); *State v. Moreno*, 173 Wn. App. 479, 492, 294 P.3d 812, *review denied*, 177 Wn.2d 1021, 304

P.3d 115 (2013). To justify a *Terry* stop, the police officer must identify specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant an intrusion. *Terry*, 392 U.S. at 21; *State v. Armenta*, 134 Wn.2d at 10. The officer's actions must be justified at their inception. *Gatewood*, 163 Wn.2d at 540.

The level of articulable suspicion necessary to support an investigative detention is "a substantial possibility that criminal conduct has occurred or is about to occur." *State v. Kennedy*, 107 Wn.2d 1, 6, 726 P.2d 445 (1986). Use of the word "possibility" suggests that the information known to the officer need not support a probability of criminal activity. The requisite level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989). Although a *Terry* stop may be based upon "suspicion," use of the modifier "articulable" suggests the suspicion must be clear and explainable. Another formulation of the *Terry* stop rule requires facts to form the suspicion. An officer's reasonable suspicion that a suspect is engaged in criminal activity is insufficient if the officer cannot articulate objective facts warranting the reasonable suspicion. *State v. Richardson*, 64 Wn. App. 693, 697, 825 P.2d 754 (1992). A hunch alone does not warrant police intrusion into people's everyday lives. *State v. Doughty*, 170 Wn.2d at 63. Innocuous facts alone do not justify a stop. *State v. Tijerina*, 61 Wn. App. 626, 629, 811 P.2d 241 (1991).

9

The law enforcement officer must observe more than criminal activity in the vicinity of someone he stops. The circumstances must suggest a substantial possibility that the particular person has committed a specific crime or is about to do so. *State v. Garcia*, 125 Wn.2d 239, 242, 883 P.2d 1369 (1994); *State v. Martinez*, 135 Wn. App. 174, 180, 143 P.3d 855 (2006). There must be some suspicion of a particular crime and a particular person, and some connection between the two. *State v. Martinez*, 135 Wn. App. at 181-82.

When reviewing the merits of an investigatory stop, a court must evaluate the totality of circumstances presented to the investigating officer. *Doughty*, 170 Wn.2d at 62. Those circumstances include the officer's training and experience. *State v. Glover*, 116 Wn.2d 509, 514, 806 P.2d 760 (1991); *State v. Moreno*, 173 Wn. App. at 492. A police officer may rely on his experience to evaluate apparently innocuous facts. *Martinez*, 135 Wn. App. at 180; *State v. Samsel*, 39 Wn. App. 564, 570-71, 694 P.2d 670 (1985). Facts which appear innocuous to the average person may appear incriminating to a police officer in light of past experience. *Samsel*, 39 Wn. App. at 570. Police officers are not required to set aside that experience. *Samsel*, 39 Wn. App. at 570-71; *State v. Moreno*, 173 Wn. App. at 493.

Despite framing the propriety of a *Terry* stop in terms of it being an issue of fact and based on the totality of the circumstances, Washington courts have ruled as a matter of law that certain facts do not constitute articulable suspicion. Being in a high-crime

10

area at night is not enough to justify a stop when there is no evidence that a particular crime had been committed. *Glover*, 116 Wn.2d at 514; *State v. Thompson*, 93 Wn.2d 838, 842, 613 P.2d 525 (1980). Exiting a suspected drug house late at night does not justify a stop. *State v. Doughty*, 170 Wn.2d at 62, 64. The reputation of a home, building, or neighborhood is general in nature, whereas suspicion must be specific to an individual. *Richardson*, 64 Wn. App. at 697. Consorting with a suspected drug dealer late at night in a high-crime area does not justify a *Terry* stop. *State v. Richardson*, 64 Wn. App. at 697. A person of any race being out of place in a particular neighborhood can never be used as a basis for suspecting criminal behavior. *State v. Gleason*, 70 Wn. App. 13, 17, 851 P.2d 731 (1993). The police may not stop and question citizens on the street simply because they are unknown to the police or look suspicious, or because their purpose for being abroad is not readily evident. *Terry*, 392 U.S. at 14 n.11; *State v. Martinez*, 135 Wn. App. at 181.

Before the trial court and on appeal, Wesley Weyand emphasized *State v. Doughty*, 170 Wn.2d 57 (2010) as controlling our decision. *Doughty* holds importance to the resolution of this appeal, but, because of diverging facts, *Doughty* does not alone provide an answer. We must look to other Washington and even foreign decisions for a complete answer.

In *State v. Doughty*, Officer Derek Bishop of the Spokane Police Department observed, at 3:20 a.m., Walter Doughty park his car, approach a house, return to his car

11

less than two minutes later, and drive away. Bishop did not see any of Doughty's actions at the house or if Doughty interacted with anybody inside. Neighbors previously complained of frequent short stay traffic at the house, prompting police to identify the residence as a "drug house." The State presented no evidence of unlawful drug usage or illegal drug purchases at the home. The State lacked evidence of known drug users or dealers frequenting the house.

Officer Derek Bishop stopped Walter Doughty's car, arrested him for driving without a license, and searched Doughty and his car. Bishop seized a glass pipe and methamphetamine. The *Doughty* court held: "Police may not seize a person who visits a location—even a suspected drug house—merely because the person was there at 3:20 a.m. for only two minutes." 170 Wn.2d at 63. Police never saw any of Doughty's interactions at the house. He may not have even interacted with anybody there. As far as Officer Bishop knew, Doughty knocked and nobody answered. Doughty may have approached the wrong house. The two-minute length of time Doughty spent at the suspected drug house and the time of day did not justify the police's intrusion into Doughty's private affairs.

Our trial court distinguished *Doughty* in that 95 Cullum was known to be a drug house. The home in *Doughty* was only suspected to be a drug pavilion. We recognize this distinction but doubt the difference alone justifies the stop of Wesley Weyand. *Doughty* does not hold that exiting a known, as opposed to suspected, drug house late at

night supports reasonable, articulable suspicion.

Other decisions are important to resolving this appeal. In *State v. Richardson*, 64 Wn. App. 693, 825 P.2d 754 (1992), the court held the investigative detention to be unlawful. At the time of the seizure, the officer knew only that Jerry Ray Richardson was in a high crime area, late at night, walking near someone the officer suspected of running drugs. Consorting with a suspected drug dealer late at night in a high-crime area did not justify a *Terry* stop. The officer needed individualized suspicion directed at Richardson. Although the officer had a reasonable suspicion of criminal activity by Richardson, the officer did not articulate the suspicion based upon objective facts.

A decision that emphasizes finding articulable suspicion based upon the law enforcement officer's experience and training is *State v. Moreno*, 173 Wn. App. at 492. Dispatch informed Yakima Police Sergeant Joe Salinas of multiple reports of gunfire in a city block. Sergeant Salinas had considerable experience with gangs in this neighborhood and knew the Sureño gang controlled the area. Upon responding to the neighborhood, Salinas observed a car driving hurriedly out of an alley. The driver, Joshua Bojorquez, wore a red shirt, associated with the rival Norteño gang. Based on these facts, Salinas stopped the car. We upheld the stop on the ground that Sergeant Salinas, based on his education and wisdom, reasonably believed the car was involved in the drive-by shooting or had information that would help solve the crime.

13

Of more importance is *State v. Gleason*, 70 Wn. App. 13, 851 P.2d 731 (1993). In *Gleason*, this court repeated the rule that a person of any race being out of place in a particular neighborhood can never be used as a basis for suspecting criminal behavior. Police saw Anglo John Gleason, dressed in clean casual clothes, leaving an apartment complex principally occupied by Hispanics, where narcotics had been sold in the past. Based on the totality of the circumstances, the *Gleason* court held it improper to seize a person merely for exiting an apartment complex that had a history of drug sales. The court noted that Gleason had not been seen in the area before, the officers did not know what occurred inside the apartment complex, and neither officer saw him involved in the purchase of drugs. Police did not see Gleason acting suspiciously or carrying any unusual objects. Although officers saw Gleason enter an apartment complex rather than a specific unit of housing, *Gleason* may support a conclusion that even exiting a known drug house lacks a basis for a stop. Its facts are closer to the circumstances on appeal than are the facts in *Doughty*.

We believe law enforcement must observe more than the accused exiting a known drug home at night to justify a *Terry* stop. The facts in this appeal include other relevant activity, however, considered by Bryce Henry as suspicious. Wesley Weyand and his companion walked quickly from the home and looked up and down the street. The companion repeated this surveillance before entering the car. These factors are absent in *Doughty* and *Gleason*.

14

The additional acts seem innocuous. Wesley Weyand and his companion just as likely walked fast because of a cold temperature during an early morning in December. They could have looked up and down the street because their respective mothers taught them to look both ways before crossing the road. Weyand's companion may have looked again, before entering the car, because he intended to pull the car into traffic. Bryce Henry, based on his experience and training and the totality of the circumstances, thought otherwise.

We find no Washington decision that discusses the relevance of walking fast or peering up and down the street. Thus, we roam other jurisdictions.

A case favorable to the accused is *People v. McGill*, 159 Misc. 2d 947, 607 N.Y.S.2d 569 (Sup. Ct. 1993). Police Officer Howard looked inside a novelty store that sold shoulder holsters, knives, and jewelry. He observed Gregory McGill purchasing a shoulder holster. McGill exited the store, looked eastward in Howard's direction and then back and forth along the street, and began to walk eastbound carrying an attaché case and a box of donuts. Howard approached McGill, told him that he saw him try on a holster, and asked whether he carried a gun. McGill politely and cooperatively responded in the negative. Howard asked McGill if he could inspect his briefcase, to which Howard testified McGill assented. The search spotted a loaded .25–caliber automatic pistol. The court first held that the nature of the stop required a founded suspicion that criminal activity was afoot. When reviewing the facts, the court mentioned

15

that Gregory McGill walked out of the store, looked side to side and then walk down the street. The court ruled that the record lacked a founded suspicion of criminality and granted the motion to suppress.

All other cases support the State's position. In *People v. Ocasio*, 85 N.Y.2d 982, 652 N.E.2d 907, 629 N.Y.S.2d 161 (1995), another New York decision, Officer Meehan, surveilled a building where drug dealing was suspected. Meehan saw Jose Ocasio and Joseph Torres pull up in a car in front of the building, look up and down the street, enter the building briefly, and then drive away. Another officer approached the car at a red light, tapped on the window, and asked for identification. The stop led to an officer finding a stolen wallet, checks, and credit cards. The court held that the questioning at the traffic light constituted an interference with Ocasio's rights such that the officer needed an articulable basis for requesting information. The court also held that the observations of Officer Meehan that prompted him to alert the backup officers, the nature of the area, and the conduct of Ocasio and Torres, met the minimum requirement. The court did not address what conduct contributed to the articulable basis.

In *In re Forfeiture of a 1981 Ford Auto.*, 520 So. 2d 631 (Fla. Dist. Ct. App. 1988), an anonymous caller informed police that a van parked inside A–1 Canvas Products was being unloaded of marijuana. Detective Michael Spasaro traveled to the business to inspect the area. Ten minutes later a 1981 Ford LTD arrived, and the driver, John Coppe, parked and went inside. Coppe returned outside, as someone else raised the

16

business's bay door. Coppe backed the Ford into the bay area. Spasaro looked inside the bay area and saw a blue van with its doors open. The Ford, with its trunk open, was next to the back of the van. Spasaro saw Coppe and another man inside. Coppe returned outside and took a couple of prolonged looks up and down the street. Coppe then pulled the bay door down as far as possible, to the roof of the car. Five to seven minutes later the bay door opened and the Ford drove out. Spasaro stopped the car and approached the driver's side of the Ford. Spasaro identified himself to Coppe and asked him to step onto the sidewalk. Spasaro bent down and put his nose up against the trunk of the Ford, and he smelled marijuana. Coppe argued that he was unlawfully stopped, and therefore any evidence seized as a result of the stop was inadmissible as "fruit of the poisonous tree." The appellate court reversed the lower court and held that the anonymous tip, combined with the surrounding circumstances, provided Spasaro, an experienced narcotics officer, with reasonable suspicion to justify a "stop." The court did not outline the relevant circumstances or whether the glances down the street contributed to reasonable suspicion.

In *United States v. Smith*, 386 F. App'x 399 (4th Cir. 2010), Officers Matthew Sammons and Corey Hurst patrolled a high crime area. The police dispatcher announced over the police radio that an anonymous 911 caller reported a fight involving a handgun near Church and Anne Streets. A few blocks away from the reported location of the fight, Officers Sammons and Hurst observed an adult male and two juveniles running toward the officers' police vehicle. The three individuals slowed to a fast walk as they

approached the police car. They looked straight ahead without making eye contact with the police officers. The officers exited the car and questioned Peter Smith and his two companions. Both officers observed that one of the three individuals, Brandon Curtis, was shoeless. Officer Hurst noticed that Brandon's left eye was red and beginning to swell. Officer Sammons asked Smith if he carried anything illegal, but the officer could not remember Smith's response. Officer Sammons advised Smith that he was going to pat him down and reached out toward him. Smith turned and "shuffle-stepped" away. Both officers grabbed Smith to prevent him from fleeing and a struggle ensued. After arresting Smith, Officer Hurst searched Smith's front pockets and found several rocks of cocaine.

In *United States v. Smith*, Smith later argued that a group of men walking at a fast pace in a high crime neighborhood near the location of a reported fight, who slowed their pace and did not meet the gaze of the police upon seeing them is not sufficient to justify a *Terry* stop. The court held that it must look to the totality of the circumstances and the totality presented justifiable suspicion of criminal activity. The court did not answer whether a fast walk, or the slowing of the walk, was relevant in the calculus of reasonable suspicion.

We consider the State of Washington to have presented the slimmest of evidence needed to justify the stop of Wesley Weyand. For this reason, we do not wish the opinion to become precedential and we decline publishing it. We note, nonetheless, that

18

Corporal Bryce Henry did not need to show by a preponderance of the evidence that Weyand or his companion engaged in criminal activity. A substantial possibility was enough. We hold that, based on the totality of the circumstances, Corporal Henry, with his experience and training as a law enforcement officer, had a reasonable, articulable suspicion that justified the stop. The circumstances included the long history of drug activity at 95 Cullum, the time of night, the 20 minute stop at the house, the brisk walking, and the glances up and down the street. When the trial court finds the officer's observations and impressions credible, Washington case law directs us to consider Henry to have some expertise in determining whether criminal activity is afoot. Persuasive cases suggest a fast walk and peering up and down the street may be included in the calculus of reasonable suspicion.

Although we base our decision, in part, on the conclusion drawn by Bryce Henry grounded in his experience and training as an officer, we note a danger in giving deference to a law enforcement officer's experience. The officer's transmutation of innocuous facts into incriminating facts by his experience may be a practice that engenders difficulty for a court to determine if the officer articulates objective facts warranting reasonable suspicion. An officer could opine that his training and knowledge establish that one is possibly purchasing illegal substances when he exits a suspected drug house during earlier morning hours, a judgment that would conflict with *State v. Doughty*.

19

CONCLUSION

We affirm the trial court's denial of Wesley Weyand's motion to suppress and affirm his conviction.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Korsmo, J.