# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59023-9-II |
| Respondent, | |
| v. | |
| KENDALL MONROE GODWIN, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—In August 2020, a masked person with a gun robbed an inn and a fast-food restaurant in Kelso. Police broadcast a description of the suspect as a tall, slender, white man wearing sweatpants and a long-sleeved shirt. Police also set up a containment area in the general vicinity. Police then found what appeared to be some of the robber's clothes, including his mask, and broadcast that the suspect may have changed his clothes.

Officer Trevor Wolff saw Kendall Godwin walking in a nearby park. Godwin was a slender, white man wearing only basketball shorts. Noting that Godwin generally met the suspect description, that the suspect could have shed some clothes, and that Godwin's presence on foot in the park was unusual during a police containment and COVID-19 restrictions, Wolff ordered Godwin to stop. Godwin ran, swimming across a river before police arrested him. DNA testing revealed that Godwin's DNA was on the robber's mask.

The State charged Godwin with two counts of first degree robbery and one count of first degree burglary, all with firearm enhancements. Before trial, Godwin moved to suppress any

evidence gathered as a result of Wolff's initial order to stop, claiming that Wolff did not have reasonable, articulable suspicion to detain him. The trial court denied the motion. The jury found Godwin guilty of all charged crimes and firearm enhancements. Godwin's sentence included three, 60-month firearm enhancements, running consecutively.

Godwin appeals. We conclude that to the extent the trial court stated that public safety threats reduce the reasonable, articulable standard necessary to support an investigative stop, it erred. However, applying the proper standard and assessing the totality of the unique circumstances of this case, Wolff did have reasonable, articulable suspicion to detain Godwin. Additionally, notwithstanding dicta from a recent Washington Supreme Court decision that potentially suggests otherwise, robbery is not an alternative means offense for the purpose of determining jury unanimity. So the State was not required to present sufficient evidence to support that Godwin both used force or fear to obtain stolen property and used force or fear to retain that stolen property. Finally, we hold that none of the remaining issues that Godwin raises in his statement of additional grounds (SAG) constitutes reversible error. Accordingly, we affirm.

FACTS

I. BACKGROUND

At about 3:46 p.m. on August 15, 2020, police received a call that there had been an armed robbery at a fast-food restaurant in Kelso. At the drive-through, the masked robber showed an employee a cardboard sign demanding money and pulled out a gun. The robber then crawled through the drive-through window and another employee gave him about $150 from the cash register. That employee saw the robber exit the restaurant and go toward the back of the hotel next door.

While investigating at the restaurant, police got a call that a nearby inn had also been robbed about 20 minutes before the restaurant robbery. The robber similarly entered the inn and demanded cash, showing employees a gun in his waistband. Employees gave the robber $276 and he left. Police also went to investigate at the inn.

While investigating, the police set up a "containment" in the nearby area to allow a dog to track the suspect. 1 Verbatim Rep. of Proc. (VRP) at 314. Police set a containment by placing police vehicles in fixed positions in a radius around a location, which alerts the public to police activity and "secures, hopefully, a boundary so that if a suspect is trying to get through, somebody will spot [them]." 1 VRP at 320. The restaurant that the suspect robbed is next to the hotel that the suspect ran towards, which borders the boundary of Tim O'Shanter Park.[1]

Officer Wolff arrived at the general scene of the robberies about 45 minutes after hearing a police broadcast about the robbery investigation. When Wolff arrived, supervisors gave him a description of the suspect and told him to patrol the area. The suspect was described as a six-foot-tall, slender, white man wearing blue sweatpants with a stripe and a dark, long-sleeved shirt.

While driving under I-5 near the hotel, Wolff saw Godwin, a white male with no shirt and basketball shorts, in Tim O'Shanter Park. Godwin is five feet, eight inches tall. Wolff did not detain Godwin because his clothing did not match the description of the suspect.

In the meantime, police reviewed surveillance footage from the hotel next door to the restaurant. It showed a person wearing clothing similar to the suspect's running behind the

---

[1] While it appears that there were maps admitted as evidence at trial, we do not have maps of the area in our record on appeal. We take judicial notice of street maps of the area near the Kelso restaurant. *See State v. Nichols*, 161 Wn.2d 1, 5 n.1, 162 P.3d 1122 (2007) (noting that courts "routinely take judicial notice of maps").

maintenance shed that was located behind the hotel about a minute after police received the call about the restaurant robbery. Four minutes later, a person wearing black basketball shorts with a white stripe walked out from behind the maintenance shed area. At the time of the robbery, Godwin was unhoused and was usually camping in the same area behind the hotel. There is no evidence in the record showing that the surveillance video showed anyone else leaving the area behind the hotel around the same time.

A police dog tracked to bushes in the area behind the hotel, where police found several items of clothing, including clothing similar to what the suspect was wearing during the robberies. Significantly, police found a "black torn cloth" that one officer said, "looked to me like whatever the suspect had used to wrap his head and face." 1 VRP at 301.

After finding the clothing in the area behind the hotel, police broadcasted that the suspect "may have changed clothing." 1 VRP at 82. Police did not say that the suspect was wearing basketball shorts. Wolff then determined that the person he had seen earlier may fit the new description of the suspect: a six-foot-tall, slender, white man. Wolff returned to the park and saw Godwin, who was the only person walking around the area. Wolff noted that the lack of pedestrians was consistent with a police containment presence and the COVID-19 restrictions in place at the time. Wolff activated the lights on his police car, and without any preliminary statement or question, drew his gun and ordered Godwin to stop and show Wolff his hands. Godwin then started running toward a nearby river. Godwin swam across the river and was eventually arrested on the other side.

Before Wolff attempted to arrest Godwin, a police dog had been tracking generally toward Godwin's location near the river from the area behind the hotel. However, once the dog's handler

4

was informed that police had found a suspect near the river, he broke the dog's track and ran toward Godwin.

On August 17, two days after the robberies, police collected cheek swabs from Godwin while he was in jail. Additionally, days after the robberies, a property owner near where police arrested Godwin found a wet bag and contacted the police. The bag contained money, totaling $371 in small bills; syringes; and other random items. The weather had been dry for several days before the police found the wet bag with the money.

The State charged Godwin with two counts of first degree robbery with firearm enhancements and one count of first degree burglary with a firearm enhancement.

## II. SUPPRESSION HEARING

Before trial, defense counsel moved to suppress evidence obtained as a result of Wolff's attempt to detain Godwin and Godwin's resulting arrest. Defense counsel argued that Wolff's actions constituted an unlawful seizure. At a hearing on the suppression motion, the State argued that Wolff's conduct was reasonable when considering the totality of the circumstances because there was an ongoing investigation of two armed robberies.

Wolff testified at the hearing. Wolff said that he had heard an armed robbery had recently occurred at the fast-food restaurant. Wolff stated that though he knew there was a containment area near the hotel next door, he was unsure exactly what the containment area encompassed. He testified that he was told to "remain mobile" in his car in case "something else came up." 1 VRP at 79.

Wolff testified that Godwin was the only person he saw walking around the area, which was consistent with the police containment and COVID-19 restrictions.

5

After police found the clothes behind the hotel, Wolff realized that "potentially the suspect shed his clothing." 1 VRP at 83. As a result, Godwin, who Wolff described as "roughly the same height, or a similar height, slender, skinny white male" wearing only basketball shorts, could fit the updated description of the suspect. 1 VRP at 83-84. Wolff said that when he observed Godwin from his car, he could not specifically discern Godwin's height. But Wolff testified that a four-inch height difference was "within a reasonable margin of error." 1 VRP at 84.

The trial court denied the suppression motion, entering written findings of fact and conclusions of law, including the following:

> 5. Cowlitz County Sheriff's Deputy Trevor Wolff also responded to the area of the robberies. Dep. Wolff was informed that containment of the area had been completed and his duty would be to stay on active and mobile patrol within the containment area.
> . . . .
> 2. When the police are called on to swiftly respond to a significant threat to public safety, a court must apply a less stringent standard to assess the reasonableness of the officers' actions than in cases involving no such threat. A report [of] an actual or threatened use of a firearm can present a significant risk to public safety supporting an investigatory stop without further indicia of reliability.
> . . . .
> 5. The Defendant was the only person within close proximity of the location of the two armed robberies. The Defendant generally matched the description of the suspect that was provided. Dep. Wolff was aware that the suspect had altered his appearance after committing the robberies.

Clerk's Papers (CP) at 44 (Finding of Fact (FF) 5), 45 (Conclusions of Law (CL) 2, 5).

### III. TRIAL

At trial, the jury saw surveillance videos from the fast-food restaurant, the hotel next door to the restaurant, and the inn that was also robbed.[2] The jury heard testimony from police and employees consistent with the facts outlined above.

---

[2] These videos are not in our record.

A detective testified that it was unlikely the cardboard sign that the robber handed to the fast-food restaurant employee would have usable fingerprints because fingerprints typically only show on "smooth surface[s]". 1 VRP at 391.

The jury also heard that based on testing of his buccal swab, Godwin was a major contributor of DNA on the black cloth believed to be the robber's mask found behind the hotel. There were three other DNA contributors found on the black cloth. A forensic scientist testified that someone might leave more DNA on an item "if a person handles an item more, or [it] touches their skin more." 1 VRP at 414. Additionally, some people "seem to leave behind more DNA than other individuals on items." *Id.*

One police officer testified that he had spoken with Godwin five days before the robberies and Godwin had been wearing a face mask similar to the cloth that was recovered. Additionally, the jury saw a photograph of Godwin immediately after he was detained, wearing black basketball shorts with a white stripe.

A different officer testified that while he set up containment in Tim O'Shanter Park, he thought he remembered "people walking around." 1 VRP at 399. However, no officer testified that any other people besides the suspect entered the area behind the hotel and no one other than Godwin exited the same area on the surveillance footage or during the investigation.

Godwin testified at trial and denied committing the robberies. Godwin testified that on the day of the robberies, he was behind the hotel when someone came into the area with a gun and a mask. Godwin then left the area and went to the park. Godwin said that he ran from Wolff and other officers because he had outstanding probation warrants and had drugs on his person. At trial, defense counsel showed Godwin the black cloth found behind the hotel, and Godwin denied

owning it, stating that it looked familiar "[b]ecause of this trial in my case." 1 VRP at 438. Godwin also stated that other people would stay behind the hotel. He admitted that he had been found trespassing on the hotel property by police officers the day before the robberies but had not run from them then. At one point, defense counsel asked Godwin, "And do you have a job now?" 1 VRP at 443. Godwin replied, "Yes." *Id.*

A.      Jury Instructions and Closing Arguments

Before closing arguments, the trial court instructed the jury that the attorneys' statements "are not evidence," and jurors "must disregard any remark, statement, or argument that is not supported by the evidence." 1 VRP at 454. The jury instruction for robbery stated that a person commits a robbery when they unlawfully take another person's personal property against their will by the use or threatened use of force, violence, or fear of injury. Additionally, "[t]he force or fear must be used to *obtain or retain* possession of the property." CP at 85 (emphasis added).

During closing argument, the State cited the fact that Godwin's DNA "was found on the clothes." 1 VRP at 471. Seemingly referring to the black cloth, the State then said Godwin was the major contributor of DNA, "indicating that he had more contact with that item than anyone else." *Id.* When talking about the investigation, the State said, "There's nothing back there behind the [hotel] -- they didn't find anybody else in that area. They didn't find any other person. [Godwin] was the only person." 1 VRP at 481.

The State also noted Godwin's flight from the police: "The Defendant, he runs when he's contacted. Why would he? What does that tell you? Is it because he didn't want to get caught, and that he unlawfully took personal property from the person or in the presence of another?" 1 VRP at 474.

8

In its rebuttal closing argument, the State said that at first, Godwin "testified when he was up there that it was his mask and he testified that he didn't know how his DNA got on [it]. So, there's a little bit -- you're the sole judge of the credibility of the witnesses." 1 VRP at 492. The State also said to the jury, "You heard that [Godwin] was homeless. Heard that he was using drugs. What motive would he have to go and rob your [fast-food restaurant]? Would it be to go over there to get more money, to fuel that? He's unemployed, homeless, using drugs." 1 VRP at 495.

Discussing the cardboard sign that the robber gave to the restaurant employee, the State said that cardboard "is not a surface that's conducive for getting fingerprints," and "[w]hen you touch cardboard, it doesn't leave a fingerprint behind." 1 VRP at 491. The State explained that police did not test the blue sweatpants they found behind the hotel because items have to come into contact with skin to leave DNA, and Godwin was wearing black basketball shorts underneath the blue sweatpants, so he would not have had much contact with them.

Finally, the State again mentioned Godwin's flight:

> And then lastly, why would he run? He didn't just all of a sudden, from the night before, you know, when he's been sleeping and staying in the bushes, know that he has these warrants or whatever, right? These probation violations, he had been aware of those the night before, but he didn't run. Five days before, he didn't run. But he ran. Why? Because he did it.
> . . . .
> Everything points to the Defendant. The DNA, dog sniff, clothes, all of them. He ran because he knew he did it. He jumped across -- went across the Coweeman River. People don't just go across the river when they're being contacted by law enforcement unless they have done something wrong. And what he did wrong was go over to the [fast-food restaurant], rob it at gunpoint; rob the [inn] at gunpoint; and then also unlawfully entered that [restaurant], all with a firearm. Find him guilty.

1 VRP at 495-96.

B.    Verdict and Sentencing

During deliberations, the jury asked to rewatch several videos that had been played during trial. The trial court allowed the jurors to rewatch video exhibits they saw during trial in the presence of both attorneys. The attorneys were not permitted to talk to jurors during this time. Godwin's attorney agreed to this plan.

The jury found Godwin guilty of the charged crimes and firearm enhancements. The trial court noted that Godwin's convictions for first degree burglary and first degree robbery of the restaurant encompassed the same criminal conduct and counted as one crime for the purpose of determining Godwin's offender score. However, the trial court also stated that RCW 9.94A.533, the firearm enhancement statute, requires that all firearm enhancements run consecutively to each other, notwithstanding any other provision of law. Accordingly, the trial court sentenced Godwin to 140 months for the convicted crimes, running concurrently, and a total of 180 months for the three 60-month firearm enhancements, running consecutively to each other and to the underlying crimes. In total, the trial court sentenced Godwin to 320 months.

ANALYSIS

I. GODWIN'S INITIAL DETENTION

Godwin argues that Wolff's demand that Godwin stop while Wolff's gun was drawn was an unlawful seizure, and the trial court erred by denying defense counsel's motion to suppress evidence obtained as a result of that seizure.

Under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution, law enforcement may not seize a person without a warrant unless a specific exception to the warrant requirement applies. *State v. Z.U.E.*, 183 Wn.2d 610,

617, 352 P.3d 796 (2015). The State bears the burden of showing that a warrantless seizure falls within an exception. *Id.* If the State fails to meet this burden, the court must suppress the fruits of the unlawful seizure. *State v. Tysyachuk*, 13 Wn. App. 2d 35, 43, 461 P.3d 403 (2020).

One exception to the warrant requirement is an investigative *Terry*[3] stop. *Id.* In a challenge to a trial court's ruling admitting evidence obtained as a fruit of a *Terry* stop, we review the trial court's findings of fact for substantial evidence and its legal determinations de novo. *State v. Fuentes*, 183 Wn.2d 149, 157, 352 P.3d 152 (2015). Evidence is substantial if it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise. *State v. Carter*, 3 Wn.3d 198, 212, 548 P.3d 935 (2024). Whether a warrantless investigative stop was ultimately justified is a question of law that we review de novo. *Tysyachuk*, 13 Wn. App. 2d at 44.

A.      Reasonable, Articulable Suspicion

1.       Legal principles

An officer can briefly detain a person without a warrant based on the officer's "'reasonable, articulable suspicion'" of criminal activity. *State v. Day*, 161 Wn.2d 889, 896, 168 P.3d 1265 (2007) (quoting *State v. Duncan*, 146 Wn.2d 166, 172, 43 P.3d 513 (2002)). The officer's suspicion must be "based on specific and articulable facts known to the officer at the inception of the stop." *Fuentes*, 183 Wn.2d at 158. Reasonable, articulable suspicion is evaluated based on the totality of the circumstances known to the officer, including "the officer's training and experience, the location of the stop, the conduct of the person detained, the purpose of the stop, and the amount of physical intrusion on the suspect's liberty." *Id.* "While we evaluate the totality of the circumstances to determine whether a reasonable suspicion of criminal activity exists, we do so, in part, by

---

[3] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

examining each fact identified by the officer as contributing to that suspicion." *Id.* at 159. The facts

must be enough to connect the seized person to the "particular" crime under investigation. *State v.*

*Johnson*, 8 Wn. App. 2d 728, 746, 440 P.3d 1032 (2019). However, a police officer may rely on

their experience to evaluate apparently innocuous facts. *State v. Martinez*, 135 Wn. App. 174, 180,

143 P.3d 855 (2006).

A police officer identifying themselves and commanding a person to stop is a show of

authority amounting to a seizure. *See State v. Rankin*, 151 Wn.2d 689, 695-96, 92 P.3d 202 (2004).

A suspect's flight from police may be considered when determining whether reasonable suspicion

existed. *State v. Howerton*, 187 Wn. App. 357, 375, 348 P.3d 781 (2015). However, reasonable

suspicion must exist at the inception of a *Terry* stop. *Fuentes*, 183 Wn.2d at 158.

  a.  A threat to public safety cannot do away with a reasonable, articulable
suspicion analysis under *Terry*

In *State v. Sieler*, the Washington Supreme Court stated that when analyzing the criteria

for whether an informant's tip to the police is sufficiently reliable to justify a *Terry* stop, "the

seriousness of the criminal activity reported by an informant can affect the reasonableness calculus

which determines whether an investigatory detention is permissible." 95 Wn.2d 43, 50, 621 P.2d

1272 (1980).

Then, in *City of Wenatchee v. Stearns*, the Washington Supreme Court recently stated, in

the context of addressing informant tips, that

> [e]ven when a reliable tip alleges a crime posing an imminent danger to the public,
> police must also have a sufficient factual basis to form reasonable suspicion of that
> crime. When a tip is reliable, that means only that the officer can treat the facts
> communicated in the tip as true, as if the officer observed the facts personally.
> Those facts, combined with any of the officer's own observations, must still give
> rise to a reasonable suspicion that criminal activity is occurring in order to justify
> the officer's decision to execute a *Terry* stop.

4 Wn.3d 773, 793, 568 P.3d 658 (2025). Thus, the possibility of imminent danger does not reduce the burden on the State to show that there was a reasonable, articulable suspicion of criminal activity to support a *Terry* stop, even when police are relying on an informant's tip.

Although this case does not involve an informant's tip, the principle stated in *Stearns* would presumably still apply where facts are quickly developing as the result of an ongoing investigation of a violent crime or a potential danger to the community. The facts must still give rise to a reasonable suspicion that the person being stopped is or has been involved in criminal activity in order to justify a *Terry* stop. A public safety concern does not obviate *Terry*. However, the Supreme Court did not say that an urgent risk to public safety could not be considered at all in the *Terry* stop analysis.

     b.  What constitutes reasonable, articulable suspicion

Though it is not binding, Godwin cites *United States v. Brown*, 448 F.3d 239 (3d Cir. 2006), as support for his argument that Wolff did not have reasonable, articulable suspicion to detain him. In *Brown*, police received a call about an armed robbery. *Id.* at 241. The victim described the perpetrators as two "African-American males between 15 and 20 years of age, one 5'8" and the other 6', wearing dark, hooded sweatshirts and running south on 22nd Street." *Id.* An officer went to the location where the suspects were allegedly last seen and saw Brown and Smith, "'two [B]lack males with dark clothing.'" *Id.* at 242 (quoting record). Police attempted to frisk Brown and Smith. *Id.* at 243.

The Third Circuit determined that "even the less stringent standard of reasonable suspicion cannot be met by a description that paints with this broad of a brush." *Id.* at 248. Additionally, Brown and Smith did not match the description of the suspects:

[T]he robbery suspects were described as between 15 and 20 years of age, but on the date of the stop Brown was 28 years old and Smith was 31 years old. Moreover, both Brown and Smith had full beards and the description of the suspects included no mention of any facial hair. Indeed, about the only thing Brown and Smith had in common with the suspects was that they were [B]lack.

*Id.*

Similarly, the Washington Supreme Court has held that general physical similarities alone do not create a reasonable, articulable suspicion that justifies misidentification. In *State v. Smith*, the court held that officers lacked reasonable, articulable grounds to arrest a person who "matched the general physical description" of the suspect they sought. 102 Wn.2d 449, 454, 688 P.2d 146 (1984). Although *Smith* concerned an erroneous arrest rather than a *Terry* stop, it is relevant here because the court addressed whether the misidentification was based on "reasonable, articulable grounds." *Id.*

In *Smith*, police were searching for a 16-year-old boy who had escaped from a juvenile facility. *Id.* at 451. The description of the suspect was a "brown-haired, white male, 5 feet 10 inches tall, weighing 145 pounds, with a tattoo on each hand." *Id.* The police received information that other children had seen the suspect near two Seattle streets the prior few evenings. *Id.* The police arrested Smith, who looked to be a 16-year-old, 5-foot, 10-inch tall, 145-pound white male with brown hair, near where the suspect had been seen. *Id.* The officers testified that "it is their general practice to frisk anyone they have to approach and question in that area of Seattle." *Id.* at 452-53.

The Washington Supreme court held that the officers' generalized suspicion of anyone in a specific area of Seattle was not sufficient to justify a *Terry* frisk. *Id.* at 453. When analyzing whether the search was a valid search incident to Smith's arrest, the Supreme Court determined that the officers did not have "reasonable, articulable grounds" to believe that Smith was the

intended arrestee because although he fit the general physical description of the suspect, he did not have the suspect's distinctive hand tattoos, something that was easy enough to check. *Id.* at 454.

The State cites *State v. Randall*, 73 Wn. App. 225, 868 P.2d 207 (1994), as a comparable case where courts found reasonable, articulable suspicion justifying a stop. About 10 minutes after a dispatch about an armed robbery, police saw Randall, who matched the description of one of the suspects, in a park about six blocks away from the site of the crime. *Id.* at 226. Randall immediately left the park when an officer approached. *Id.* The officer followed Randall and detained him. *Id.* at 226-27.

Division One concluded that under the totality of the circumstances, the police had reasonable, articulable suspicion that Randall was engaged in, or had just engaged in, criminal activity. *Id.* at 230-31. The court reasoned that the officer knew an armed robbery had just occurred, and he knew the location of the store and the description of the robbers—information that was "fairly specific." *Id.* at 230. About 10 minutes after hearing the dispatch, the officer saw Randall, who fit the description of one of the robbers, only about six blocks from the location of the robbery, in a park that "was not used frequently at that time of the evening." *Id.* at 231. Additionally, Randall fled when he saw the officer approaching. *Id.* Accordingly, the investigatory stop was reasonable. *Id.*

In *State v. Moreno*, an officer heard reports of gunshots and a vehicle leaving the scene. 173 Wn. App. 479, 484, 294 P.3d 812 (2013). About two minutes later, the officer saw a car driving quickly out of an unpaved alley near the gunshots. *Id.* The officer observed that the driver was wearing a red shirt, a color associated with a gang that was generally not common in that neighborhood. *Id.* at 484-85. Division Three concluded that the officer had reasonable, articulable

15

suspicion to stop the car because he was responding to a violent crime in progress that happened minutes before and only a block away; he had experience with gangs in that specific neighborhood and knew that wearing a red shirt was uncommon; and he saw the car driving quickly through an alley, despite its poor conditions. *Id.* at 493. Accordingly, the officer's determination that the car was involved in the shooting was reasonable and the stop was valid. *Id.*

In summary, when evaluating the totality of the circumstances known to the officer, courts consider the factors listed in *Fuentes* to the extent they are relevant in a particular case: "the officer's training and experience, the location of the stop, the conduct of the person detained, the purpose of the stop, and the amount of physical intrusion on the suspect's liberty." 183 Wn.2d at 158. And when considering the totality of the circumstances surrounding a stop based on an active search for a suspect in a recent or ongoing crime, courts have specifically considered whether the description of the suspect was sufficiently specific, whether the detained person had obvious and distinct characteristics differentiating them from the described suspect, whether the detained person was close to the scene of the crime shortly after it occurred, whether the detained person's presence in the area was uncommon or suspicious given other circumstances, and whether there was an ongoing public safety threat. Courts do not evaluate these nonexclusive factors in isolation but rather consider the totality of the circumstances that may have contributed to an officer's decision to stop someone for further investigation.

2. Application in this case

a. The trial court's recitation of the relevant standard

In this case, Godwin first argues that the trial court misstated the law by concluding, "When the police are called on to swiftly respond to a significant threat to public safety, a court must apply

a less stringent standard to assess the reasonableness of the officers' actions than in cases involving no such threat." CP at 45 (CL 2). The trial court also concluded that the "report [of] an actual or threatened use of a firearm can present a significant risk to public safety supporting an investigatory stop without further indicia of reliability." *Id.* Godwin contends that this lesser standard only applies to evaluations of *informant* reliability when an informant provides a tip to the police about a suspect.

While we acknowledge that individuals who have committed violent crimes often pose a public safety threat that police must consider, *Stearns* recently reiterated that this does not lower the reasonable, articulable suspicion standard for *Terry* stops. 4 Wn.3d at 793. And this case does not involve informant reliability issues. So Godwin is correct that the trial court misstated the applicable standard to the extent it suggested that a risk to public safety warranted an investigatory stop based on anything less than a reasonable, articulable suspicion.

Still, the case law described above shows that courts may consider that a suspect posed a public safety threat as *one* of the facts contributing to whether an officer had reasonable, articulable suspicion supporting a *Terry* stop. *See, e.g.*, *Moreno*, 173 Wn. App at 493. In other words, while courts cannot reduce the *Terry* stop standard of reasonable, articulable suspicion, they can consider public safety threats in the context of the *Terry* stop analysis. Accordingly, here, while the fact that the armed robbery suspect was likely still armed and on foot in the community was something that the trial court could consider in its analysis, the trial court erred to the extent it stated that courts should apply a less stringent standard to assess reasonable, articulable suspicion when there is a public safety threat.

Nevertheless, because we apply de novo review to the validity of the *Terry* stop, we apply the correct standard to the facts established at the suppression hearing to determine whether Wolff had reasonable, articulable suspicion to detain Godwin.

### b.     Factual application

Godwin also argues that even if the trial court applied the correct standard, Wolff did not have reasonable, articulable suspicion to detain him. Godwin challenges several of the trial court's findings of fact and contends that the trial court erred by concluding that Wolff's seizure of Godwin was justified based on the information Wolff knew at the time:

> First, the suspect description was so general that it could not support individualized suspicion of any person. Second, even the general suspect description did not fit Mr. Godwin, and did not support individualized suspicion as to him. Third, Mr. Godwin's presence in a public park half a mile away from the robberies could not provide individualized suspicion.

Br. of Appellant at 23. The State responds that Wolff had reasonable, articulable suspicion to detain Godwin because of Godwin's proximity to the crimes, his location in the containment area, and his location in a park that was not frequently used because of COVID-19 restrictions.

When assessing whether an officer had reasonable, articulable suspicion for a *Terry* stop, we evaluate the totality of circumstances known to the officer, including "the officer's training and experience, the location of the stop, the conduct of the person detained, the purpose of the stop, and the amount of physical intrusion on the suspect's liberty." *Fuentes*, 183 Wn.2d at 158. We examine "each fact identified by the officer as contributing to that suspicion." *Id.* at 159. When doing so, we should engage in the considerations that courts have applied when evaluating *Terry* stops made while searching for suspects in recent or ongoing crimes.

As an initial matter, both parties agree here that Wolff detained Godwin when he made contact with Godwin, pulled his firearm in a low ready position, and ordered Godwin to put his hands up. Godwin did not flee until after Wolff told him to stop and put his hands up. So, regarding the conduct of the person detained, Godwin's flight is not a factor that could have contributed to whether Wolff had reasonable, articulable suspicion to detain Godwin. *See id.* at 158.

The State cites Godwin's similarity to the described robbery suspect as a fact contributing to Wolff's reasonable, articulable suspicion of Godwin. On one hand, the description of the suspect was extremely broad: a slender, white male about six feet tall. In *Brown*, the Third Circuit held that reasonable, articulable suspicion was not met by a description as broad as two Black males between 15 and 20 years old, five feet, eight inches and six feet tall, wearing dark clothing. 448 F.3d at 247-48. This description in *Brown* is significantly more detailed than what police knew about the suspect here. Additionally, Godwin did not match every characteristic of the described suspect: Godwin is five feet, eight inches tall, four inches shorter than the six-foot-tall suspect. In *Brown*, the Third Circuit noted that the detained individuals did not match key descriptors of the suspects because they were ten years older and had facial hair, which weighed against finding that police had reasonable, articulable suspicion to seize them. *Id.* at 248. In *Smith*, Smith matched the age, race, height, weight, and hair color of the suspect, and the Washington Supreme Court still determined that police did not have general, articulable suspicion justifying their misidentification of him. 102 Wn.2d at 454. The Supreme Court pointed out that Smith did not have, and the police did not look for, the distinctive hand tattoos that were a key identifying characteristic of the suspect. *Id.* While a four-inch height difference is potentially less significant or obvious than the

absence or presence of facial hair and specific, distinctive tattoos, it is still a discrepancy that we should consider when determining whether Wolff was justified in demanding that Godwin stop.

However, unlike in *Smith* or *Brown*, besides the discrepancy in heights, there were no glaring differences between the described suspect—a slender, white male—and Godwin. Additionally, Godwin wore only basketball shorts and Wolff testified that he knew that the suspect had potentially "shed his clothing." 1 VRP at 83. Accordingly, the trial court's finding that Godwin "generally matched the description of the suspect" was supported by substantial evidence. CP at 45 (CL 5).

Also, Wolff testified at the suppression hearing that a four-inch height difference is "within a reasonable margin of error." 1 VRP at 84. Wolff also testified that he knew the suspect potentially had a firearm and therefore posed a public safety threat. An officer may rely on their experience to determine whether there is reasonable, articulable suspicion to detain someone. *Martinez*, 135 Wn. App. at 180. Here, Wolff determined that a height difference of four inches was not significant when compared to the other facts pointing to Godwin's involvement in the robberies, particularly where the purpose of the stop was to apprehend a potentially armed suspect who posed a public safety risk and prevent him from escaping the area

While we acknowledge that Godwin's similarities to the broad description of the suspect alone would not likely be enough to constitute reasonable, articulable suspicion, his presence in the park under the particular circumstances of COVID-19 restrictions and the police containment area are important facts contributing to whether Wolff had reasonable, articulable suspicion justifying detainment.

Godwin contends that because Wolff did not know where the police had set the containment area, the location of the *Terry* stop was not a convincing factor contributing to reasonable, articulable suspicion supporting Godwin's detainment. However, the park where Wolff detained Godwin was adjacent to the hotel, which was near the locations of both armed robberies, and Wolff knew that the canine track was set in the area of the hotel. Given this proximity, it would not be unreasonable for Wolff to assume that the park would be within the containment area, or at least a likely place where the suspect may have gone. And Wolff was told to stay mobile in case the suspect appeared. Accordingly, the trial court's finding that Wolff "was informed that containment of the area had been completed and his duty would be to stay on active and mobile patrol within the containment area" was supported by substantial evidence. CP at 44 (FF 5).

Regarding whether the location of the *Terry* stop supported Wolff's detainment of Godwin, this case is distinguishable from *Randall* to some degree. In *Randall*, police found two males who matched the descriptions of the suspects—though the opinion does not say how specific those descriptions were—in a park 10 minutes after the crime, 6 blocks away from the crime, and late at night. 73 Wn. App. at 230-31. Importantly, the men also fled when they saw police approach, which is a fact that can be considered by police if it occurs *before* an attempted detainment. *Id.* at 231; *see Howerton*, 187 Wn. App. at 375.

Here, Godwin was walking in a public park less than half a mile away from where the crimes occurred, 40 minutes after they occurred, and in the middle of the day. These circumstances seem to create more separation between Godwin and the crimes than existed in *Randall*. And, unlike Randall, Godwin did not flee until after Wolff attempted to detain him, so his flight was not

a factor that Wolff could have considered. *Fuentes*, 183 Wn.2d at 158. Though Godwin's presence in a public park may have been odd during a COVID-19 stay-at-home order, that is not enough on its own to connect Godwin to the crimes, especially given that unhoused people would still be likely to be in public places despite any COVID-19 restrictions.

On the other hand, Godwin's presence in the park—when considered in light of his similarities to the described suspect—was particularly conspicuous under the totality of the unique circumstances here. Even if Wolff did not know the exact bounds of the containment area, he knew that the park was adjacent to the hotel, which was the last known location of the suspect. Wolff knew that there was an increased police presence in the area to intercept any suspects if they attempted to escape—Wolff was indeed a part of this increased police presence—and Godwin was the only person Wolff had observed walking in the area.[4] Additionally, the COVID-19 stay-at-home orders further reduced the number of people that would be in the park. A police officer may rely on their experience to evaluate apparently innocuous facts, which is what Wolff did here. *Martinez*, 135 Wn. App. at 180.

After assessing the totality of the circumstances and the unique facts that Wolff knew, we hold that Wolff had reasonable, articulable suspicion to detain Godwin. This conclusion is bolstered when we consider the purpose of the stop, which was to prevent an armed suspect from

---

[4] Godwin challenges the trial court's finding that Godwin was "the only person within close proximity of the location of the two armed robberies," as Wolff testified that he had seen vehicle traffic on nearby roads. CP at 45 (CL 5). However, this finding was included in the trial court's "conclusions of law" as to why Wolff had reasonable, articulable suspicion to detain Godwin. In the findings of fact section, the trial court wrote, "At the time of his patrol, Dep. Wolff had not located a single other person walking in the vicinity of location of the two armed robberies." CP at 44 (FF 8). Given this context, we conclude the trial court's finding that Godwin was "the only person" near the robberies, indicated that he was the only person walking in the area at the time. CP at 45 (CL 5). This finding was supported by substantial evidence.

fleeing or wandering around the area. While this entire issue may have been avoided if Wolff initially approached Godwin without his firearm drawn and did not immediately order Godwin to stop, we recognize that police have to make difficult decisions when there are active and serious public safety concerns. Keeping that consideration in mind and evaluating the totality of the unique circumstances in this case, we conclude that Wolff had a reasonable, articulable suspicion that Godwin was the robbery suspect, so his detainment of Godwin was not an unlawful seizure.

## II. JURY UNANIMITY

Godwin argues that his right to a unanimous jury was violated because the trial court instructed the jury to determine his guilt as to two alternative means of committing robbery but gave no unanimity instruction requiring the jury to be unanimous as to which means Godwin committed. Specifically, Godwin argues that the trial court did not provide a jury unanimity instruction as to whether Godwin used force or fear to *obtain* property or to *retain* property, and he asserts the State did not present any evidence that Godwin *retained* property by force or fear.

Under article I, section 21 of the Washington State Constitution, criminal defendants have a right to a unanimous jury verdict. *State v. Owens*, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014). Criminal defendants are sometimes charged with alternative means crimes, which are crimes "where the legislature has provided that the State may prove the proscribed criminal conduct in a variety of ways." *State v. Armstrong*, 188 Wn.2d 333, 340, 394 P.3d 373 (2017). For alternative means crimes, the jury need not be unanimous as to the means by which the defendant committed the crime if substantial evidence supports both alternative means submitted to the jury. *Id.* However, if there is not sufficient evidence supporting both means, "a particularized expression of jury unanimity is required." *Owens*, 180 Wn.2d at 95. One way to ensure jury unanimity is for

the trial court to instruct the jury that it must be unanimous as to means. *State v. Smith*, 17 Wn. App. 2d 146, 151, 484 P.3d 550 (2021). Alternatively, the State can elect which means the jury should rely on when deliberating. *Id.* at 159.

RCW 9A.56.190, the statute defining robbery provides:

A person commits robbery when [they] unlawfully [take] personal property from the person of another or in [their] presence against [their] will by the use or threatened use of immediate force, violence, or fear of injury to that person or [their] property or the person or property of anyone. *Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking*; in either of which cases the degree of force is immaterial.

(Emphasis added.)

In *State v. Todd*, Division Three explained that the use of disjunctive language in a criminal statute does not necessarily create an alternative means crime. 200 Wn. App. 879, 888, 403 P.3d 867 (2017). Instead, when determining if a statute outlines an alternative means crime, courts should ask "whether the statute describes distinct acts that amount to the same crime." *Id.* "'The more varied the criminal conduct, the more likely the statute describes alternative means. But when the statute describes minor nuances inhering in the same act, the more likely the various alternatives are merely facets of the same criminal conduct.'" *Id.* (internal quotation marks omitted) (quoting *State v. Sandholm*, 184 Wn.2d 726, 734, 364 P.3d 87 (2015)). Accordingly, Division Three held that using force or fear to initially obtain possession of stolen property and using force or fear to later retain that property are sufficiently similar acts that they do not constitute alternative means of robbery. *Id.*

This court has also determined that, under Washington Supreme Court precedent, a statute does not create an alternative means crime if the separate acts outlined in the statute "simply

represent different aspects of a single type of criminal conduct." *Smith*, 17 Wn. App. 2d at 156. Accordingly, this court held that statutory language stating a person is guilty of residential burglary if the person "'enters or remains unlawfully'" does not create an alternative means crime. *Id.* (quoting RCW 9A.52.025(1)). "The actual conduct the statute prohibits is being present in a dwelling *unlawfully*," and entering and remaining are merely variations on that same prohibited conduct. *Id.* Thus, residential burglary was not an alternative means crime. *Id.* at 157.

After these two cases, in *State v. Derri*, the Washington Supreme Court analyzed whether a charging document adequately set forth all the essential elements of robbery. 199 Wn.2d 658, 691-92, 511 P.3d 1267 (2022). The Supreme Court concluded that the sentence "'force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking'" is an essential element of robbery. *Id.* at 692 (emphasis omitted) (quoting RCW 9A.56.190); *see also id*. at 696. Instead of defining "taking," this sentence "expands the range of activity criminalized as robbery." *Id.* at 695. "Thus, [this] sentence *essentially* indicates that robbery is an alternative means crime. There are at least two ways to rob someone—taking by force or fear or retaining by force or fear—but the State must prove only one of those ways to obtain a conviction." *Id.* (emphasis added).

We acknowledge this language from *Derri* suggests that robbery is an alternative means crime, but the relevant statement was not the ultimate holding of the case; it was dicta. *See Johnson v. Wash. State Liquor & Cannabis Bd.*, 197 Wn.2d 605, 618, 486 P.3d 125 (2021) ("'Statements in a case that do not relate to an issue before the court and are unnecessary to decide the case constitute obiter dictum, and need not be followed.'" (internal quotation marks omitted) (quoting *In re Pers. Restraint of Domingo*, 155 Wn.2d 356, 366, 119 P.3d 816 (2005))). The court qualified

the statement with "essentially," and the court did not say it was overruling *Todd*, even though *Todd* was mentioned elsewhere in the opinion. *See Derri*, 199 Wn.2d at 693, 695. Importantly, the characterization of robbery as an alternative means crime was not the stated holding of the case, and we are not bound by it. *Id.* at 695.

Instead, we follow *Todd* and the similar reasoning in *Smith*. We conclude that obtaining and retaining stolen property through the use of force or fear are similar acts describing the same overall criminal conduct. The purpose of the robbery statute is to prohibit using force or fear to take property from another. Like entering and remaining in a dwelling for residential burglary, in the robbery statute, obtaining and retaining stolen property are "merely 'nuances inhering in the same [prohibited] act' and 'facets of the same criminal conduct.'" *Smith*, 17 Wn. App. 2d at 156 (internal quotation marks omitted) (quoting *State v. Barboza-Cortes*, 194 Wn.2d 639, 646, 451 P.3d 707 (2019)). The focus of the robbery statute is the *use of force or fear* to obtain or retain the property. Instead of stating that a person is guilty of robbery by using force or fear to obtain property or using force or fear to retain property, the statute reads, "Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking." RCW 9A.56.190. *Derri* acknowledges that it is important to include both obtaining and retaining when discussing robbery to avoid erroneously excluding the situation where a person initially takes property without force or with permission and later uses force to keep that property. 199 Wn.2d at 695. However, this distinction, while important for a full understanding of how Washington defines robbery, does not mean that obtaining and retaining stolen property are sufficiently different acts as to constitute alternative means.

Accordingly, we hold that for the purpose of jury unanimity, robbery is not an alternative means crime. As a result, because it is undisputed that the State presented sufficient evidence that Godwin used force or fear to obtain property from both the fast-food restaurant and the inn, Godwin's jury unanimity argument fails.

### III. PROSECUTORIAL MISCONDUCT AND INEFFECTIVE ASSISTANCE OF COUNSEL

Godwin argues that his convictions should be reversed due to several instances of prosecutorial misconduct. Godwin acknowledges his defense counsel did not object to the prosecutor's statements that he challenges on appeal.

For a prosecutorial misconduct claim, the defendant must prove that the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). To determine whether a prosecutor's remarks were improper, we evaluate the remarks in the context of the prosecution's entire argument. *State v. Anderson*, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009).

When a defendant fails to object to a prosecutor's comments, they waive a prosecutorial misconduct claim unless they show that the comments were improper as well as flagrant and ill intentioned, that a curative instruction would not have remedied any prejudice, and that there is a substantial likelihood the misconduct affected the jury's verdict. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). We "'focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured.'" *State v. Gouley*, 19 Wn. App. 2d 185, 201, 494 P.3d 458 (2021) (quoting *Emery*, 174 Wn.2d at 762).

First, Godwin argues that the prosecutor committed misconduct by misrepresenting the record during closing argument. Specifically, Godwin argues that the prosecutor alleged facts not

in evidence by asserting that Godwin admitted to owning the black cloth that police believed was the robber's mask but denied knowing how his DNA got on it.

Prosecutors may not mislead the jury by misstating the evidence presented at trial. *State v. Meza*, 26 Wn. App. 2d 604, 620, 529 P.3d 398 (2023). However, a prosecutor has wide latitude to assert reasonable inferences from the evidence. *Id.*

Here, during its rebuttal closing argument, the prosecutor stated, "[Godwin] first testified when he was up there that it was his mask and he testified that he didn't know how his DNA got on [it]. So, there's a little bit -- you're the sole judge of the credibility of the witnesses." 1 VRP at 492. However, Godwin did not testify that he owned or wore the mask during trial.

Godwin argues that this statement was prejudicial because it attacked his credibility and character, which were essential to the main issue of identity in this case. Godwin also contends that no jury instruction could have cured the prejudice from this statement because the statement would have confused the jury, and the trial court was not permitted to remind the jury what Godwin actually said during his testimony.

We agree that the prosecutor misstated evidence by stating that Godwin testified the mask was his. And the black cloth mask was a key piece of evidence in the trial, as it connected the clothing worn by the suspect to Godwin. Accordingly, it was error for the prosecutor to say during closing arguments that Godwin testified that he owned the mask when he did not.

However, this error was not prejudicial. The trial court instructed the jury that the attorneys' statements were not evidence. And we presume that jurors follow instructions. *State v. Weaver*, 198 Wn.2d 459, 469, 496 P.3d 1183 (2021).

28

Additionally, there was other significant evidence connecting Godwin to the mask: one officer said that he had recently seen Godwin wearing a similar black cloth as a mask, the black cloth tested positive for Godwin's DNA, and it was found behind the hotel, where the suspect was last seen on the hotel's surveillance footage and where Godwin was temporarily staying.

Therefore, because this statement was not prejudicial, Godwin's prosecutorial misconduct claim fails.

Second, Godwin argues that the prosecutor alleged facts not in evidence by stating in closing arguments that Godwin was "*unemployed*, homeless, [and] using drugs." 1 VRP at 495 (emphasis added). The State argues that the fact of Godwin's alleged unemployment was in the record because Godwin testified during trial that he has a job *now*, which indicated that he did not have a job at the time of the robberies.

While it is error for a prosecutor to misstate evidence presented at trial, prosecutors have "'wide latitude'" to make reasonable inferences from the evidence. *Meza*, 26 Wn. App. 2d at 620 (quoting *Thorgerson*, 172 Wn.2d at 448). Though Godwin did not directly testify that he was unemployed at the time of the charged crimes, his affirmative answer when asked if he was *now* employed during trial was sufficient for the prosecutor to make an inference of prior unemployment. Additionally, Godwin's employment status was not relevant to any element of the crimes. While Godwin argues that the prosecutor's comment went to his credibility, he does not provide any cases demonstrating that this kind of comment would be prejudicial in these circumstances. And because we hold that neither of the prosecutor's challenged statements was prejudicial, defense counsel's failure to object also did not constitute ineffective assistance of counsel.

IV. FIREARM ENHANCEMENTS

Godwin argues that the trial court abused its discretion by not recognizing its authority to impose concurrent firearm enhancements. However, the Washington Supreme Court has recently reaffirmed that under RCW 9.94A.533(3)(e), firearm enhancements must run consecutively and a sentencing court does not have discretion to impose them concurrently.[5] *State v. Kelly*, 4 Wn.3d 170, 192, 561 P.3d 246 (2024). While we acknowledge Godwin's rehabilitative efforts while he awaited trial and the fact that his sentence was significantly extended by firearm enhancements, we are bound by the Supreme Court's current holding on this issue.

V. SAG ARGUMENTS

A.    CrR 3.3 Speedy Trial

Godwin argues that the trial court violated his statutory right to a speedy trial outlined in CrR 3.3. Under CrR 3.3(b)(1)(i), a defendant detained in jail must be brought to trial within 60 days of their arraignment. However, a trial court may continue trial beyond this date based on a motion from either party if the continuance "is required in the administration of justice" and the defendant's case will not be prejudiced. CrR 3.3(f)(2). Under the rule, a motion for a continuance "by or on behalf of any party waives that party's objection to the requested delay." *Id.* We review a trial court's decision to grant or deny a motion for a continuance for an abuse of discretion. *State v. Ollivier*, 178 Wn.2d 813, 822-23, 312 P.3d 1 (2013).

Godwin was arraigned on August 27, 2020. Because of COVID-19 shutdowns, on October 13, 2020, the Washington Supreme Court published an order stating that time between May 29,

---

[5] In *Kelly*, the Washington Supreme Court addressed the version of the statute amended in 2024. Though Godwin committed his crimes in August 2020, the relevant statutory language in effect then is identical.

2020, and the defendant's next scheduled court hearing after October 15, 2020, should be excluded when calculating time for trial under CrR 3.3. Ord. re: Modification of Jury Trial Proc., *In re Statewide Response by Washington State Courts to the COVID-19 Public Health Emergency*, No. 25700-B-646, at 7-8 (Wash. Oct. 13, 2020).[6]

Godwin specifically challenges the trial court's continuances on September 24, 2020, January 22, 2021, and August 2, 2021, as violating his CrR 3.3 speedy trial right.

Because of the Washington Supreme Court's October 2020 order, none of the dates between August 7, 2020, when Godwin was arraigned, and October 15, 2020, are relevant for calculating his time for trial date under CrR 3.3. Thus, his challenge to a continuance on September 24, 2020, fails. And the initial trial date of December 8, 2020, was within 60 days of October 15, which was the earliest date the time for trial clock could have started running.

At a hearing on January 22, 2021, the trial court had good cause to continue Godwin's trial past the time for trial date due to COVID-19 concerns and to ensure that important DNA testing could be completed by the forensic lab. Additionally, on August 2, 2021, the trial court had good cause to continue the trial because there were new witnesses and potential investigative leads "that may be of benefit to both parties." 1 VRP 54. Accordingly, the trial court did not abuse its discretion by granting continuances on January 22, 2021, and August 2, 2021, because the continuances allowed both parties time to gather and prepare new evidence and thus were required in the administration of justice and likely benefited, rather than prejudiced, Godwin's defense. The trial court did not violate Godwin's right to a speedy trial under CrR 3.3.

---

[6] https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Orders/Extended%20and%20Revised%20Supreme%20Court%20Order%20October%202020.pdf

B.      Insufficient Evidence

Godwin argues that there was insufficient evidence supporting his convictions because the State failed to prove that the black cloth found behind the hotel was the mask that the perpetrator wore. Godwin argues that given the DNA results from the cloth, this issue goes to the identity of the perpetrator, which is an essential element of the crime.

When reviewing a claim of insufficient evidence, this court asks whether, viewing all the evidence in the light most favorable to the State, a rational trier of fact could find that all of the crime's essential elements were proven beyond a reasonable doubt. *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). Under this standard, the defendant admits the truth of the State's evidence and all reasonable inferences that arise therefrom. *Id.* at 265-66. Both circumstantial and direct evidence are considered equally reliable. *Id.* at 266.

When reviewing a claim of insufficient evidence, we do not "reweigh the evidence and substitute our judgment for that of the jury." *State v. McCreven*, 170 Wn. App. 444, 477, 284 P.3d 793 (2012). Rather, because the jury "observed the witnesses testify firsthand, we defer to the jury's resolution of conflicting testimony, evaluation of witness credibility, and decisions regarding the persuasiveness and the appropriate weight to be given the evidence." *Id.*

Here, the jury saw surveillance videos of the robbery from the fast-food restaurant and the inn, and it saw footage of someone in similar clothing going behind the hotel minutes after the restaurant robbery occurred. The jury also saw the black cloth that was found behind the hotel and heard testimony from an officer that it looked like what the suspect had used to wrap his head and face.

We do not reweigh the evidence and we defer to the jury's determination on credibility. *Id.* Based on this record, a rational trier of fact could have concluded that the black cloth was the one worn by the robber. And a forensic scientist testified that Godwin's DNA was on the black cloth. Accordingly, Godwin's claim of insufficient evidence fails.

C.    <u>Sentencing</u>

Godwin argues that his convictions for first degree burglary and first degree robbery, which both related to the events at the restaurant, violate double jeopardy. Specifically, he claims that the consecutive firearm enhancements imposed for those crimes violate double jeopardy because the convictions for the two crimes encompass the same criminal conduct.

RCW 9A.52.050 states, "Every person who, in the commission of a burglary shall commit any other crime, may be punished therefor as well as for the burglary, and may be prosecuted for each crime separately." Under this burglary antimerger statute, trial courts have discretion to punish burglary as a separate offense, even if burglary and robbery constitute the same criminal conduct. *State v. Knight*, 176 Wn. App. 936, 962, 309 P.3d 776 (2013).

Under RCW 9.94A.589(1)(a), if a trial court enters a finding that some convictions encompass the same criminal conduct, then for the purpose of calculating a defendant's offender score, those convictions "shall be counted as one crime," and their sentences "shall be served concurrently." However, RCW 9.94A.533, the statute imposing firearm enhancements, states, "*Notwithstanding any other provision of law*, all firearm enhancements under this section are mandatory" and "shall run consecutively to all other sentencing provisions." RCW 9.94A.533(3)(e) (emphasis added).

Here, the trial court noted that Godwin's convictions for first degree burglary and first degree robbery of the restaurant encompassed the same criminal conduct and counted as one crime for the purpose of determining Godwin's offender score under RCW 9.94A.589. However, the trial court also stated that under RCW 9.94A.533, all firearm enhancements must run consecutively to each other, notwithstanding any other provision of law.

Under RCW 9A.52.050, the antimerger burglary statute, Godwin's convictions for both burglary and robbery of the restaurant did not violate double jeopardy. And the trial court correctly imposed concurrent sentences and slightly reduced the offender scores for these crimes under RCW 9.94A.589(1)(a). The trial court also properly sentenced Godwin to consecutive firearm enhancements given the strong language of the firearm enhancement statute and the Washington Supreme Court's current interpretation of the statute. *See State v. Mandanas*, 168 Wn.2d 84, 88, 228 P.3d 13 (2010) (holding that courts must impose multiple firearm enhancements even where the underlying crimes constitute the same criminal conduct); *Kelly*, 4 Wn.3d at 192-94 (holding that courts must impose multiple firearm enhancements consecutively).

D.      Ineffective Assistance of Counsel

Godwin argues that defense counsel was ineffective for failing to argue that the trial court violated his statutory right to a speedy trial under CrR 3.3. However, because we hold that the trial court did not violate Godwin's rights under CrR 3.3, defense counsel was not ineffective on this issue.

Godwin also argues that defense counsel was ineffective because she did not argue the issues of same criminal conduct and double jeopardy at sentencing regarding the firearm sentencing enhancements. However, given the definitive language from the firearm enhancement

statute, neither of those arguments would have prevented the full application of the firearm enhancements. Accordingly, defense counsel was not ineffective by not arguing them.

Finally, Godwin argues that defense counsel was ineffective because she did not argue against the burglary charge. Godwin also contends that defense counsel was ineffective because she did not argue against the firearm enhancements; for example, by telling the jury that the gun could have been fake or explaining that the presence of a firearm needed to be proved beyond a reasonable doubt.

To succeed on an ineffective assistance of counsel claim, a defendant must show that defense counsel did not have a legitimate strategic or tactical reason for the challenged conduct. *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021).

Here, the defense's primary theory was not that the crimes did not occur, but rather that Godwin was not the perpetrator, which aligned with Godwin's own denial that he committed the crimes. Therefore, defense counsel's decision not to specifically mention the burglary charge or debate the presence of a firearm was likely a strategic decision not to be inconsistent with the identity theory. Accordingly, her performance was not deficient and Godwin's ineffective assistance of counsel claim fails.

E.    Prosecutorial Misconduct

In his SAG, Godwin argues that several of the prosecutor's comments during closing arguments constituted misconduct. Because Godwin did not object to any of these statements below, he must show that they were improper as well as flagrant and ill intentioned, that a curative instruction would not have remedied any prejudice, and that there is a substantial likelihood the misconduct affected the jury's verdict. *Emery*, 174 Wn.2d at 760-61. Prosecutors have "wide

latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury." *State v. Boehning*, 127 Wn. App. 511, 519, 111 P.3d 899 (2005).

First, Godwin seemingly contends that the prosecutor erred by stating: "There's nothing back there behind the [hotel] -- they didn't find anybody else in that area. They didn't find any other person. [Godwin] was the only person." 1 VRP at 481. Godwin argues that this statement was incorrect because an officer testified that he might have seen other people walking in the park where Wolff attempted to detain Godwin. However, the prosecutor's statement addresses the fact that police did not see other people behind the hotel at or near the time of the crimes, which is not a contested fact. Accordingly, the prosecutor's statement was not improper.

Godwin argues that the prosecutor committed misconduct because the prosecutor said that the surveillance video from the inn showed Godwin "folding up [] the money." 1 VRP at 472. Godwin contends that this never happened. We do not have access to this video in the record on appeal, so we cannot assess the accuracy of this statement. As a result, this claim fails.

Godwin claims that the prosecutor committed misconduct by indicating that Godwin ran from the police because he was guilty. Evidence of flight may be considered by juries in criminal trials. *State v. Slater*, 197 Wn.2d 660, 668, 486 P.3d 873 (2021). However, prosecutors must not express a personal opinion about the guilt of the defendant. *Id.* at 681.

The Washington Supreme Court has found prosecutorial misconduct where a prosecutor incorrectly commented that a single missed court date was evidence of flight and demonstrated the defendant's consciousness of guilt. *Id.* at 683. The court has also held that a prosecutor committed misconduct when, during closing argument, "the prosecuting attorney made an electronic presentation to the jury that graphically displayed his personal opinion that [the defendant] was

'guilty, guilty, guilty' of the crimes charged by the State." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 699, 286 P.3d 673 (2012) (plurality opinion). The court concluded that this "use of highly inflammatory images unrelated to any specific count was misconduct that contaminated the entire proceedings." *Id.* at 712.

Here, during closing argument, the State first said, "The Defendant, he runs when he's contacted. Why would he? What does that tell you? Is it because he didn't want to get caught, and that he unlawfully took personal property from the person or in the presence of another?" 1 VRP at 474. In these statements, the prosecutor did not provide an opinion on Godwin's guilt. The prosecutor simply asked questions encouraging the jury to consider Godwin's flight as potential evidence of consciousness of guilt.

The State's comments during its rebuttal closing argument were more direct:

> And then lastly, why would he run? He didn't just all of a sudden, from the night before, you know, when he's been sleeping and staying in the bushes, know that he has these warrants or whatever, right? These probation violations, he had been aware of those the night before, but he didn't run. Five days before, he didn't run. But he ran. Why? *Because he did it.*
> . . . .
> Everything points to the Defendant. The DNA, dog sniff, clothes, all of them. *He ran because he knew he did it.* He jumped across -- went across the Coweeman River. People don't just go across the river when they're being contacted by law enforcement unless they have done something wrong. And what he did wrong was go over to the [restaurant], rob it at gunpoint; rob the [inn] at gunpoint; and then also unlawfully entered that [restaurant], all with a firearm. Find him guilty.

1 VRP at 495-96 (emphasis added).

These statements were based on significant evidence of Godwin's flight that the jury could validly consider as evidence of his guilt, and the prosecutor drew reasonable inferences from this evidence. Accordingly, the prosecutor's statements were not "inflammatory" such that we can

conclude that they were flagrant and ill intentioned or incurable. Godwin's prosecutorial misconduct claim based on these statements fails.

Godwin also contends that the prosecutor misstated the evidence by saying that Godwin was aware of the probation warrants when interacting with police before the day of the robbery. Godwin says that he did not know about the warrants during his interactions with police prior to the crimes at issue here. However, evidence demonstrating this lack of knowledge is not in the record on appeal.

Godwin claims that the prosecutor misstated the evidence by saying that Godwin's "DNA was found on the clothes" behind the hotel when only the black cloth was DNA tested. 1 VRP at 471. However, immediately after saying that Godwin's DNA was on "the clothes," the prosecutor then said Godwin's DNA was on "that item," which is singular and seemingly refers to the black cloth. *Id.* Also, the prosecutor later explained why the sweatpants found behind the hotel were not tested for DNA. Accordingly, when read in full context, the prosecutor did not confuse the jury by misstating the evidence.

Godwin challenges the prosecutor's statement that skin contact is required to leave DNA on an item as inaccurate. During closing argument, when explaining why police did not test the sweatpants found behind the hotel, the prosecutor said, "Well, you heard the DNA expert. It's got to come into contact with your skin." 1 VRP at 491. During trial, a forensic scientist testified that someone might leave more DNA on an item "if a person handles an item more, or [it] touches their skin more." 1 VRP at 414. Thus, the prosecutor's statement was reasonable based on the evidence presented at trial.

Godwin challenges the prosecutor's statement that Godwin had more contact with the black cloth than other people because among the four DNA profiles found on the black cloth, he was the major contributor. However, during trial, a forensic scientist testified that someone might leave more DNA on an item "if a person handles an item more, or [it] touches their skin more." *Id.* Accordingly, the prosecutor's statement aligns with the forensic scientist's testimony that someone might leave more DNA on an item if they touch it more.

Godwin contends the prosecutor's statement that fingerprints cannot be left on cardboard was improper because it was inaccurate. However, during trial, a police officer testified that forensics would be unlikely to get fingerprint evidence off of a cardboard sign. He explained that fingerprints typically show on "smooth surface[s]." 1 VRP at 390. Accordingly, the prosecutor's statement was based on the testimony presented at trial and was not improper.

Finally, Godwin argues that the prosecutor impermissibly inflamed jurors' passions by asking, "What motive would [Godwin] have to go and rob *your* [fast-food restaurant]?" 1 VRP at 495 (emphasis added). It is improper for prosecutors to use arguments calculated to inflame the passions or prejudices of the jury. *State v. Thierry*, 190 Wn. App. 680, 690, 360 P.3d 940 (2015). However, the prosecutor's comment here was not flagrant or ill intentioned such that it raises to the level of prosecutorial misconduct.

Godwin has not established that any of the prosecutor's statements in closing arguments constituted prosecutorial misconduct under the applicable standard.

F.    Other Arguments

    1.    Photograph in restraints

Godwin challenges the trial court's admission of a photograph of him in restraints taken after he was arrested. He argues that the photograph was improper because it was unduly prejudicial and undermined the jury's presumption of his innocence.

Evidence is only admissible if it is relevant. ER 402. Evidence is "relevant" if it tends to make any fact pertinent to the outcome of the case more or less probable. ER 401. Generally, the bar to admit relevant evidence is low, as even minimally relevant evidence is admissible. *State v. Darden*, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). However, under ER 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." We review a trial court's ruling on admissibility of evidence for an abuse of discretion. *Darden*, 145 Wn.2d at 619. For evidentiary decisions that do not implicate a constitutional mandate, error is harmless unless the defendant shows a reasonable probability that the error materially affected the outcome of the trial. *State v. Barry*, 183 Wn.2d 297, 317-18, 352 P.3d 161 (2015).

In *State v. Rivers*, Rivers' booking photograph taken after his arrest was admitted as evidence. 129 Wn.2d 697, 703, 921 P.2d 495 (1996). The Washington Supreme Court held that because Rivers raised the issue of identity during opening statements, the photograph was relevant because it showed that the described suspect matched the man arrested that day. *Id.* at 712. Additionally, the photograph was not prejudicial because the jury knew that Rivers had been arrested for the crime for which he was being tried. *Id.*

Here, the primary issue during the trial was identity. Godwin did not deny that he left the area behind the hotel in black basketball shorts after the suspect entered that area. However, the photograph of him on the day of the arrest still could have been relevant to establish identity because the jury could compare his appearance on the day of the crimes to that of the suspect in the surveillance videos. Additionally, like in *Rivers*, the jury knew that Godwin was arrested for the crimes at issue, so the likelihood of prejudice was low. Accordingly, the trial court did not abuse its discretion by admitting the photograph of Godwin after his arrest.

2.      Right to an attorney

Godwin also argues that his right to an attorney was violated because his defense attorney did not comply with the requirements of APR 8(b) when representing him at trial. Godwin's defense counsel was licensed out of state, but the trial court admitted her *pro hoc vice* under APR 8(b) to represent Godwin with the supervision of an attorney licensed in Washington. APR 8(b)(ii) allows a member of another state's bar to represent a criminal defendant "in association with an active lawyer member of the Bar, who shall be the lawyer of record therein, responsible for the conduct thereof, and present at proceedings unless excused by the court or tribunal." Godwin contends that a Washington licensed attorney was absent from most of the proceedings in his case. However, the Washington Supreme Court has held that "not every technical defect in an attorney's license status rises to the level of a Sixth Amendment violation." *In re Pers. Restraint of Lewis*, 200 Wn.2d 848, 872, 523 P.3d 760 (2023). And Godwin does not explain or provide any authority stating how this alleged absence impacted his defense or warrants relief. Accordingly, his claim fails.

3. Right to be present

Godwin argues that his right to be present was violated because he was absent when, during deliberations, the jury rewatched videos already admitted as evidence during trial.

"A criminal defendant has a fundamental right to be present at all critical stages of a trial." *State v. Irby*, 170 Wn.2d 874, 880, 246 P.3d 796 (2011). A critical stage is one where the defendant's presence has a reasonably substantial relation to "'the [fullness] of his opportunity to defend against the charge.'" *Id.* at 881 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 674 (1934)). However, criminal defendants do not have the right to be present when their "'presence would be useless, or the benefit but a shadow,'" like during in-chambers conferences about legal or ministerial issues. *Id.* (quoting *Snyder*, 291 U.S. at 106-07).

Generally, "there should be no communication between the court and the jury in the absence of the defendant." *State v. Caliguri*, 99 Wn.2d 501, 508, 664 P.2d 466 (1983). In his SAG, Godwin cites *Caliguri*, where the Washington Supreme Court held that it was error to replay evidence tapes for the jury without prior notice to Caliguri or his counsel, and without Caliguri's presence. *Id.* However, the court noted that this error only required reversal if it was prejudicial. *Id.*

Here, before jury deliberations began, the trial court determined that the jury could come into the courtroom to rewatch videos that were played as evidence during trial as long as both attorneys were present and did not discuss anything with the jury. Godwin's attorney agreed to this plan. During deliberations, the jury requested to see several videos that had played during trial. Under this procedure, Godwin's presence would have been useless because neither of the attorneys were allowed to speak with the jury while they watched the videos. Additionally, nothing in the

record supports an inference that the jury viewed videos that were not admitted into evidence and shown at trial. Thus, any potential violation of Godwin's right to be present was not prejudicial. Godwin's claim fails.

### 4. Juror competence

Godwin argues that we should reverse his convictions because one of the jurors was elderly, so she could not step into the juror box and fell asleep during the trial. However, he does not cite any facts in the record, nor do we see anything in the record, supporting these assertions. On direct appeal, reviewing courts do not consider matters outside the trial record. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Accordingly, this argument would be better addressed in a personal restraint petition.

### 5. Cumulative error

Finally, Godwin argues that the alleged errors in this case cumulatively require a new trial. SAG at 35. "'The cumulative error doctrine applies where a combination of trial errors denies the accused of a fair trial, even where any one of the errors, taken individually, would be harmless'" *State v. Azevedo*, 31 Wn. App. 2d 70, 85, 547 P.3d 287 (2024) (quoting *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018) (plurality opinion)). When the errors have little or no effect on the outcome at trial, no new trial is required. *In re Pers. Restraint of Morris*, 176 Wn.2d 157, 172, 288 P.3d 1140 (2012).

The potential errors in this case, even when taken together, did not deny Godwin a fair trial. Thus, we hold that Godwin's cumulative error claim fails.

No. 59023-9-II

CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

_____
GLASGOW, J.

We concur:

Maxa, J.

_____
MAXA, J.

Veljacic, A.C.J.

_____
VELJACIC, A.C.J.